**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

| | |
|---|---|
| CATHOLIC BENEFITS ASSOCIATION,<br>DIOCESE OF FARGO, and CATHOLIC<br>CHARITIES NORTH DAKOTA<br><br>          Plaintiffs,<br><br>v.<br><br>SYLVIA M. BURWELL, Secretary of the<br>United States Department of Health and<br>Human Services; UNITED STATES<br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES; JENNY R. YANG,<br>Chair of the United States Equal Employment<br>Opportunity Commission; and UNITED<br>STATES EQUAL EMPLOYMENT<br>OPPORTUNITY COMMISSION<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil No. _____ |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

**Table of Contents**

I.    NATURE OF THE ACTION ................................................................................4

II.   JURISDICTION AND VENUE ..........................................................................9

III.  PARTIES..............................................................................................................9

    A.    Plaintiffs ...................................................................................................9

        1.    Diocese of Fargo.............................................................................9

        2.    Catholic Charities North Dakota ..................................................11

        3.    Catholic Benefits Association .......................................................12

    B.    Defendants ...............................................................................................15

IV.   PLAINTIFFS' BELIEFS AND PRACTICES RELATED TO THE ACTS
      MANDATE..........................................................................................................16

    A.    Catholic teaching on the duty to treat all persons with dignity......................16

    B.    Catholic teaching on gender identity ..........................................................17

    C.    Catholic teaching on abortion.....................................................................18

    D.    Catholic teaching on scandal.......................................................................19

    E.    The Ethical and Religious Directives...........................................................19

    F.    The Catholic Benefits Association's Ethics Committee ................................20

V.    THE ACTS MANDATE ......................................................................................21

    A.    Statutory Overview..................................................................................21

        1.    Section 1557 of the Affordable Care Act......................................21

        2.    Title IX of the Education Amendments of 1972............................22

        3.    Title VII of the Civil Rights Act of 1964......................................23

        4.    Congress has consistently rejected attempts to expand the meaning of
            "sex" in Title VII and Title IX......................................................24

        5.    Congress has, in other contexts, barred discrimination on the basis of
            gender identity. ..............................................................................25

        6.    Anti-abortion provisions in or applicable to the Affordable Care Act ..........25

    B.    After Congress passed the ACA, and contrary to congressional will, federal
        agencies unilaterally sought to redefine sex discrimination. ............................27

C.   HHS's Section 1557 Rule ....................................................................29

   1.   Healthcare professionals must perform or refer for gender transition procedures. ...............................................................30

   2.   Healthcare facilities and professionals must alter their speech and medical advice. ...............................................................32

   3.   Covered employers and insurance providers must offer employee benefits covering gender transition procedures. ...............33

      a.   United Healthcare "Gender Dysphoria Rider" ...................35

      b.   Blue Cross Blue Shield of Kansas City "Treatment of Gender Dysphoria" Policy ...........................................36

   4.   Sex-specific healthcare facilities or programs, including shower facilities or hospital wards, must be opened to individuals based on gender identity. ...............................................................37

   5.   Covered entities must provide assurances of compliance. ..............37

   6.   Covered entities must post notices of compliance. ..........................38

   7.   Covered entities must train their employees on the 1557 Rule. ......38

D.   HHS rejected calls to accommodate religious exercise in its 1557 Rule. .....38

E.   The EEOC, invoking Title VII, will impose many of the requirements of the 1557 Rule against non-covered entities. ...........................................40

F.   The ACTS Mandate's enforcement mechanisms. .............................................42

VI.   The ACTS Mandate burdens the religious exercise of the CBA and its members. .................45

A.   ACTS Mandate's effects on CBA members that are covered entities – medical services ...............................................................45

B.   ACTS Mandate's effects on CBA members that are covered entities – insurance coverage ...............................................................47

C.   ACTS Mandate's effects on insured CBA members ......................................48

D.   ACTS Mandate's effects on self-insured CBA members ...............................49

VII.   URGENT NEED FOR RELIEF ...............................................................50

VIII.   CAUSES OF ACTION ...............................................................50

IX.   PRAYER FOR RELIEF ...............................................................70

3

Plaintiffs CATHOLIC BENEFITS ASSOCIATION, DIOCESE OF FARGO, and

CATHOLIC CHARITIES NORTH DAKOTA, through Lewis Roca Rothgerber Christie LLP,

allege:

## I.      NATURE OF THE ACTION

1.      For decades, federal nondiscrimination laws like Title VII and Title IX have barred

discrimination on the basis of sex. Congress has consistently rejected attempts to expand such laws

to cover sexual orientation and gender identity. The federal courts have likewise generally refused to

interpret "sex" as including sexual orientation and gender identity. But over the last few years, the

administration has sought to sidestep Congress by reinterpreting these laws through executive

actions: through regulations, announcements, and even letters that seek to "amend" federal civil

rights laws contrary to Congress's actions.

2.      This lawsuit concerns the most recent of such efforts, and the most consequential

for Catholic healthcare institutions and even Catholic employers more generally: HHS's expansive

interpretation of Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) through a May 2016

final regulation ("1557 Rule" or "Rule"). In short, HHS has taken a little-remarked-upon section of

the ACA that prohibits discrimination "on the basis of sex" and turned it into a mandate that

coerces Catholic hospitals and other healthcare providers into performing, supporting, and even

covering gender transition procedures, and coerces other Catholic employers, even Catholic

dioceses, into covering them. The 1557 Rule also prevents Catholic entities from discriminating on

the basis of "termination of pregnancy," a phrase that likely creates an abortion mandate. HHS has

refused to deny that this phrase may be used to coerce Catholic employers into performing or

funding abortions.

3.      The 1557 Rule applies directly to a "covered entity," i.e., any entity that operates a

health program or activity, any part of which receives federal financial assistance. As defined by

HHS, an entity receives federal financial assistance when it participates in Medicaid or Medicare. Thus, HHS believes that its rule covers virtually all healthcare providers and insured health plans, along with an uncertain portion of self-insured plans. The Rule requires competent healthcare providers to themselves deliver or provide, and for full-service health plans to cover, "gender transition services."

4.     Because HHS's Rule affects nearly every insurance provider, it also affects Catholic employers that are not "covered entities." Several Catholic Benefits Association ("CBA") members, including two Catholic dioceses, have already been instructed by their insurers that, due to the 1557 Rule, next year's health plans will include a "gender dysphoria" policy and will cover gender transition services such as:

a.    ***Male to female surgeries*** include: clitoroplasty (creation of a clitoris), labiaplasty (creation of a labia), orchiectomy (removal of testicles), penectomy (removal of penis), vaginoplasty (creation of a vagina), and urethroplasty (reconstruction of female urethra).

b.    ***Female to male surgeries*** include: bilateral mastectomy or breast reduction, hysterectomy (removal of uterus), metoidioplasty (creation of penis, using clitoris), penile prosthesis, phalloplasty (creation of penis), saplingo-oopherectomy (removal of fallopian tubes and ovaries), scrotoplasty (creation of scrotum), testicular prosthesis, vulvectomy (removal of vulva), urethroplasty (construction of male urethra), and vaginectomy (removal of vagina).

c.    ***Other gender transition services*** include: supportive counseling/psychotherapy and cross-sex hormone therapy. *See* Exs. E and F.

100021819_11

5.      Catholic employers cannot avoid HHS's mandate by becoming self-insured. Self-insured CBA members have been told by their third party administrators ("TPAs") that if they wish to exclude gender transition coverage from their plan, they must indemnify their TPAs.

6.      The 1557 Rule also prohibits discrimination on the basis of "termination of pregnancy." During the rulemaking process, commenters, including the United States Conference of Catholic Bishops, asked HHS to "state explicitly" that the agency was not attempting to use 1557 to create an abortion mandate. HHS refused.

7.      After considering several limitations on the ability of the government to impose an abortion mandate, it appears that this mandate, at the least, coerces group insurers into including abortion coverage in their policies.

8.      By failing to clarify that Section 1557 does not create an abortion mandate, HHS is pressuring CBA members to cover such benefits in their group health plans, thus chilling their statutory and constitutional rights.

9.      Commentators also asked HHS to create an exemption for religious employers, like the exemption under Title IX, on which the 1557 Rule was modeled. HHS refused.

10.     Finally, the 1557 Rule expressly points beyond itself, asserting that where HHS does not have jurisdiction over a given employer, the Equal Employment Opportunity Commission ("EEOC") may pursue enforcement actions under Title VII of the Civil Rights Act of 1964, employing a similarly aggressive definition of sex discrimination. The EEOC has stated on numerous occasions that it now interprets Title VII as prohibiting all discrimination on the basis of "gender identity."

11.     EEOC administers Title VII and, therefore, has jurisdiction over not only covered entities but all employers with 15 or more employees.

100021819_11

12.     Altogether, HHS's 1557 Rule and EEOC's interpretation of Title VII create an Abortion and Comprehensive Transgender Services ("ACTS") Mandate that requires the following:

a.   Under the 1557 Rule, covered entities' health plans must cover gender transition and abortion services.

b.   Competent healthcare entities and professionals must perform gender transition procedures, including hormone treatments, surgeries, and counseling, as well as abortions, even when they believe the procedures are medically unnecessary or inappropriate.

c.   Covered healthcare entities and professionals must alter their speech and advice.

d.   Employers, healthcare entities, and healthcare professionals must use the transgender employee's or patient's preferred name and pronouns even if they do not correspond to the individual's biological sex.

e.   Sex-specific healthcare facilities or programs—including sexual assault victim support groups, shower facilities, and hospital wards—must be opened to individuals based on gender identity.

f.   Regardless whether an employer is a "covered entity," virtually all fully insured group health policies must cover gender transition and abortion.

g.   Third party administrators doing business, without separate incorporation, as department or division of health insurance issuers must include gender transition and abortion services in the coverage they provide, unless the plan explicitly excludes such coverage.

h.   Employers and health insurance issuers must not deny or limit coverage for particular services if it results in discrimination against a transgender individual.

100021819_11

i.   Covered entities must provide assurances of compliance to the government and post notices of compliance in conspicuous places.

j.   Covered entities must train their employees on the 1557 Rule requirements.

k.   Where HHS finds it lacks authority to enforce its ACTS Mandate against a given employer, the EEOC may initiate an enforcement action for failure to provide coverage for gender transition services.

13.   Failure to comply with HHS's and EEOC's ACTS Mandate exposes Catholic entities to severe penalties. Covered entities can become subject to fines. They can be barred from Medicaid and Medicare, become subject to treble damages under the False Claims Act, and responsible persons may face up five years in prison. All employers will be subject to civil suits that can be initiated by government agencies, individual plaintiffs, or class plaintiffs that expose them to compensatory damages, punitive damages, and attorneys fees.

14.   The Title VII portion of the ACTS Mandate has already taken effect against Catholic Benefits Association members. The part of the HHS 1557 Rule that coerces covered entities to perform gender transition and abortion procedures has also taken effect. The remaining part of the 1557 Rule, which coerces covered entities into providing coverage for gender transitions and abortions, will take effect against covered entitles, including group insurers and TPAs, on the first day of the first plan year that begins on or after January 1, 2017. Many CBA members begin their plan year on January 1, 2017.

15.   Plaintiff Catholic Benefits Association is a Catholic membership ministry that exists to unite and serve Catholic employers who wish to live out their faith in ministry, business, and the workplace.  The CBA works and advocates for religious freedom of Catholic employers, including their right to offer healthcare services and provide employee health benefits consistent with Catholic

values. The ACTS Mandate thus not only injures CBA members, it also injures the CBA itself by rendering its mission effectively illegal.

16.     Plaintiffs seek a declaration that the ACTS Mandate cannot legally be applied to them or any CBA member, and they seek an injunction barring enforcement of the Mandate against the CBA, against all CBA members, and against any third parties acting in concert with them for the delivery of health coverage or services, including their insurers and TPAs.

## II.     JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361 because this action arises under the Constitution and laws of the United States. The Court has jurisdiction to render declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

18.     Venue lies in this district under 28 U.S.C. § 1391(e)(1). Plaintiffs The Diocese of Fargo and Catholic Charities North Dakota reside in this district and this division because their principal places of business are here.

## III.    PARTIES

### A.     Plaintiffs

#### 1.     Diocese of Fargo

19.     The Diocese of Fargo is that "portion of the people of God," located in 30 counties in eastern North Dakota, "which is entrusted to [the Bishop of Fargo] for him to shepherd" in cooperation with his priests. *See* Code of Canon Law, c. 369 (1983). The Diocese carries out the spiritual, educational, and social service mission of the Catholic Church in eastern North Dakota. Its Bishop is the Most Reverend John Thomas Folda. He exercises pastoral care and canonical support for more than 130 parishes and missions and other Catholic ministries within the Diocese.

20.     The Diocese of Fargo is a member of the Catholic Benefits Association.

21.     The Diocese of Fargo comprises 35,786 square miles and, through its parishes and other Catholic organizations, ministers to more than 71,000 Catholics and thousands of others in eastern North Dakota.

22.     The educational mission of the Diocese of Fargo is carried out, in part, through 12 elementary schools, one middle school, and one high school within the Diocese. The five diocesan schools in the Fargo metro area (three elementary schools, the middle school, and the high school) belong to the St. John Paul II Catholic Schools Network.

23.     The charitable mission of the Diocese of Fargo is carried out through local parishes and various ministries founded by or otherwise related to the Diocese, including Catholic Charities of North Dakota.

24.     The Diocese of Fargo has a Respect Life Office whose mission is to foster a culture of life and to proclaim and defend the God-given, inviolable dignity of every person. The Respect Life Office runs Project Rachel, a post-abortion ministry that offers hope and healing for those who suffer from the spiritual and emotional pain of abortion and its aftermath.

25.     Another ministry of the Diocese of Fargo is the North Dakota Catholic Conference, which acts on behalf of the Catholic bishops of North Dakota to respond to public policy issues of concern to the Catholic Church and to educate Catholics and the general public about Catholic social doctrine. Inspired by Scripture and Catholic teachings, the Conference works at the appropriate level of government for legislation and regulations that reflect the Gospel message of respect for human life, care for the poor, and promotion of the common good. The Conference advocates across a broad spectrum of issues, including alternatives to abortion, support for children and families, healthcare, religious liberty, economic justice, and care for the environment.

26.     The Diocese of Fargo operates a self-insured health plan. That is, the Diocese does not contract with a separate insurance company for health coverage. Rather, the Diocese itself

100021819_11

underwrites the medical costs of plan participants. It rents a provider network and has engaged a TPA to administer its plan.

27.     Upon information and belief, the Diocese's TPA is an operating division of the insurance company providing that network and is therefore a covered entity subject to the 1557 Rule.

28.     Consistent with Catholic values and teaching, the Diocese of Fargo's health plan categorically excludes gender transition and abortion procedures.

29.     Many of the Catholic parishes and affiliated Catholic ministries within the Diocese of Fargo participate in the diocesan health plan.

### 2.     Catholic Charities North Dakota

30.     Catholic Charities North Dakota ("Catholic Charities") serves the poor, elderly, and disabled throughout North Dakota through critical social services programs. Its mission is to serve people in need, regardless of religious affiliation, based on the fundamental principles of Catholic Social Teaching. The services of Catholic Charities include disaster relief, individual and family counseling, adoption services, pregnancy counseling, and guardianship services for adults with special needs.

31.     Catholic Charities is a member of the Catholic Benefits Association.

32.     Catholic Charities adheres to Catholic teachings, including those regarding sanctity of human life and care for one's neighbors. In partnership with PATH ND, Catholic Charities operates Adults Adopting Special Kids ("AASK"), which provides adoption services to children in foster care and the families who adopt them. Through its pregnancy and parental counseling program, Catholic Charities counsels mothers and fathers on parenting, adoption, and marriage, and connects them with community resources. In its disaster relief program, Catholic Charities provides emergency

relief and recovery services for victims of blizzards, floods, tornadoes, droughts, and wildfires, offering direct financial aid and other assistance.

33.     Catholic Charities contracts with a group health insurance company for the benefit of its employees and their families.

34.     Upon information and belief, Catholic Charities' insurer is a covered entity under the 1557 Rule.

### 3.     Catholic Benefits Association

35.     The CBA is a § 501(c)(3) nonprofit corporation and Catholic ministry. Its articles of organization state that it is "organized for charitable purposes" that are "consistent with Catholic values, doctrine, and canon law." Specifically, they state that the CBA is organized "[t]o support Catholic employers . . . that, as part of their religious witness and exercise, provide health or other benefits to their respective employees in a manner that is consistent with Catholic values"; "[t]o work and advocate for religious freedom of Catholic and other employers seeking to conduct their ministries and businesses according to their religious values"; "[t]o make charitable donations to Catholic ministries"; and "[t]o incorporate . . . one or more Catholic insurance companies, in furtherance of the Association's purposes." *See* Ex. A, Amended and Restated Certificate of Incorporation of the Catholic Benefits Association ("CBA Articles"), art. IV.

36.     The Most Reverend William E. Lori, Archbishop of Baltimore, is chairman of the CBA's board of directors.

37.     Seven of the CBA's directors are Catholic archbishops. They are Most Rev. Gregory M. Aymond of New Orleans, Most Rev. Charles J. Chaput, O.F.M. Cap. of Philadelphia, Most Rev. Paul S. Coakley of Oklahoma City, Most Rev. Bernard A. Hebda of Saint Paul and Minneapolis, Most Rev. William E. Lori of Baltimore, Most Rev. Joseph F. Naumann of Kansas City, Kansas, and Most Rev. J. Peter Sartain of Seattle. Four of its directors are Catholic lay persons, including: Helen

Alvaré, Beth Elfrey, Ed Hanway, and Carolyn Woo. Three-fourths of its directors are required to be

Catholic. *See* Ex. B, Amended and Restated Bylaws of The Catholic Benefits Association ("CBA

Bylaws) art. 5.2.

38.    All of the CBA's officers are Catholic.

39.    The CBA has a standing Ethics Committee, comprised exclusively of the

archbishops on its board. The CBA's bylaws state:

> The Ethics Committee shall have exclusive authority to review all benefits, products,
> and services provided by the Ministry [i.e. the Association], its affiliates or
> subsidiaries, or their respective contractors to ensure such conform with Catholic
> values and doctrine. If they do not, the committee shall determine the necessary
> corrections to bring such benefits, products, and services into conformity with
> Catholic values and doctrine. The decision of the committee shall be final and
> binding on the Association, its board, and its officers . . . .

Ex. B, CBA Bylaws, art. 5.14.2.

40.    To be a member of the CBA, an organization must meet these criteria, among

others: (1) it shall be a Catholic employer, and (2) with regard to the benefits it provides to its

employees, it shall, as part of its religious witness and exercise, be committed to providing no

benefits inconsistent with Catholic values. Ex. B, CBA Bylaws art. III; Ex. C, CBA Nonprofit

Employer Application for Membership; Ex. D, CBA For Profit Employer Application for

Membership; *see also* Ex. A, CBA Amended and Restated Certificate of Incorporation, art. VI,

Members.

41.    The Bylaws of the CBA provide that "[a]n employer shall satisfy the requirement of

being Catholic if either the employer is listed in the current edition of *The Official Catholic Directory* or

the secretary or his or her designee makes such a determination." Ex. B, CBA Bylaws, art. III, §

3.1.1.

42.    The Bylaws further provide that a for-profit employer seeking membership in the

CBA "shall be deemed Catholic only if (i) Catholics (or trusts or other entities wholly controlled by

such Catholic individuals) own 51% or more of employer, (ii) 51% or more of the members of the employer's governing body, if any, is comprised of Catholics, and (iii) either the employer's owners or governing body has adopted a written policy stating that the employer is committed to providing no benefits to the employer's employees or independent contractors inconsistent with Catholic values." Ex. B, CBA Bylaws, art. III, § 3.1.2.

43.     All members of the CBA meet the Association's criteria for being Catholic.

44.     The CBA presently has over 880 employer members plus over 5,000 member Catholic parishes, covering more than 90,000 employees and their families.

45.     CBA members include over 60 Catholic dioceses and archdioceses, hospitals, Catholic Charities, mental health service providers, counseling centers, nursing homes, senior residence facilities, schools, colleges, religious orders, and other Catholic ministries and Catholic-owned businesses.

46.     CBA members include hospitals and other healthcare entities that receive Medicaid and Medicare payments and thus are covered entities under the 1557 Rule.

47.     CBA members include Catholic Charities and other social service organizations that offer counseling and other mental health services, in individual and group settings, that receive Medicaid and Medicare payments and participate in HHS-funded programs and thus are covered entities under the 1557 Rule.

48.     CBA members include employers, including Catholic dioceses and archdioceses, that provide employee health benefits in conjunction with health insurers and TPAs. These insurers and TPAs participate in federally funded marketplaces and thus are covered entities under the 1557 Rule. The 1557 Rule thus constrains CBA members' ability to arrange for and secure health plans that reflect their Catholic values.

14

100021819_11

49. CBA members include employers that are covered entities and those that are not covered entities under the 1557 Rule. Both sets of employers are subject to Title VII.

50. The CBA has standing to represent all of its present and future members.

51. The ACTS Mandate harms all of the CBA's members.

52. The CBA seeks to protect its members' ability to operate in accordance with Catholic values and to access morally compliant health coverage for their respective employees or agents. It additionally seeks, for members that are covered entities, protection from being required to provide medical services and to perform surgeries contrary to Catholic values.

53. The CBA can adequately represent its members' interests. All members are similarly situated in that the Defendants' ACTS Mandate coerces CBA members to cover, provide, pay for, or otherwise directly or indirectly facilitate access to gender transition services and abortions for their patients or for their employees in violation of their sincerely held Catholic beliefs. The ACTS Mandate also deprives or will deprive certain CBA members of the option to purchase group insurance without gender transition and abortion coverage.

54. The CBA brings this action on behalf itself and on behalf of specific members who themselves have suffered and will suffer concrete harm, and especially those members who will on January 1, 2017, suffer concrete harm as a result of Defendants' actions.

**B.      Defendants**

55. Defendants are appointed officials of the federal government and federal government agencies responsible for promulgating, administering, and enforcing the ACTS Mandate.

56. Defendant United States Department of Health and Human Services is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the 1557 Rule.

15

57.     Defendant Sylvia M. Burwell is the HHS Secretary. She is sued only in her official capacity.

58.     Defendant Equal Employment Opportunity Commission is a federal agency that administers, interprets, and enforces certain laws, including Title VII. The EEOC is, among other things, responsible for investigating employment and hiring discrimination complaints.

59.     Defendant Jenny R. Yang is the EEOC Chair. She is, in this capacity, responsible for the administration and implementation of policy within the EEOC, including the investigating of complaints of discrimination on the basis of sex. She is sued only in her official capacity

## IV.   PLAINTIFFS' BELIEFS AND PRACTICES RELATED TO THE ACTS MANDATE

60.     All Plaintiffs and all CBA members are Catholic ministries or Catholic-owned businesses that believe and practice the teachings of the Catholic Church on the nature of the human person, the dignity of humankind, the right to life, the right of conscience and religious freedom, and related ethical issues.

### A.     Catholic teaching on the duty to treat all persons with dignity

61.     The Catholic Church teaches that all people are born in the image and likeness of God and are thus imbued with human dignity. Catechism of the Catholic Church ("CCC") 1701. As such, all persons and are to be loved and respected in their human freedom. CCC 1738.

62.     The Catholic Church specifically applies this to people who reject its teaching on matters of sexual identity and sexual morality. The Church teaches that such persons "must be accepted with respect, compassion, and sensitivity. Every sign of unjust discrimination in their regard should be avoided." CCC 2358.

63.     The United States Conference of Catholic Bishops ("USCCB") has applied this teaching to transgender persons and those afflicted with gender dysphoria. In response to the U.S.

16

Department of Education's guidance letter asserting that Title IX bars discrimination based on "gender identity," the USCCB stressed that the Catholic Church "consistently affirms the inherent dignity of each and every human person and advocates for the wellbeing of all people, particularly the most vulnerable."[1] The USCCB statements affirmed that people who struggle with their gender identity "deserve compassion, sensitivity, and respect." *Id.*

64.     The comments the USCCB filed along with other Christian bodies in response to HHS's proposed rule under Section 1557 likewise affirmed that "[e]veryone should have access to health care and health coverage."[2]

65.     Defendant HHS has acknowledged that every religious group that submitted comments in response to its propose rule shared similar sentiments. Its 1557 Rule notes, "None of the commenters supporting a religious exemption asserted that there would be a religious basis for generally refusing to treat LGBT individuals for a medical condition." 81 Fed. Reg. 31,376, 31,379 (May 18, 2016).

### B.     Catholic teaching on gender identity

66.     Catholic teaching on the nature of the human person begins with the Book of Genesis, which teaches that "God created man in his own image . . . male and female he created them." CCC 2331 (quoting Genesis 1:27).

67.     The Catechism further teaches that "[e]veryone, man and woman, should acknowledge and accept his sexual identity." CCC 2333. "By creating the human being man and

---

[1] USCCB, *USCCB Chairmen Respond to Administration's New Guidance Letter on Title IX Application*, May 16, 2016, http://www.usccb.org/news/2016/16-056.cfm.

[2] Comments from USCCB et al. to U.S. Dept. of Health and Human Services Re: Nondiscrimination in Health Programs and Activities RIN 0945-AA-2 (Nov. 6, 2015), http://www.usccb.org/about/general-counsel/rulemaking/upload/Comments-Proposal-HHS-Reg-Nondiscrimination-Federally-Funded-Health.pdf.

woman, God gives personal dignity equally to the one and the other. Each of them, man and woman, should acknowledge and accept his sexual identity." CCC 2393.

68.     Pope Francis has reiterated this Catholic teaching in recent years, affirming that "man too has a nature that he must respect and that he cannot manipulate at will. . . . The acceptance of our bodies as God's gift is vital for welcoming and accepting the whole world as a gift from the Father. . . . Learning to accept our body, to care for it and to respect its fullest meaning, is an essential element of any genuine human ecology." *Laudato Si*, No. 155 (2015).

69.     As for youth who are struggling with their gender identity, Pope Francis has taught that "the young need to be helped to accept their own body as it was created." *Amoris Laetitia*, No. 285 (2016).

70.     Sexual reassignment surgery requires the destruction of healthy sexual and reproductive organs.[3]

71.     The Catholic Church teaches that intentionally removing healthy organs that identify as a person as male or female is a type of amputation or mutilation that is intrinsically evil.

72.     Some gender transition surgeries also involve sterilization. The Catholic Church teaches that all forms of sterilization are contrary to the moral law. CCC 2370.

73.      The Catholic Church teaches that "[e]xcept when performed for strictly therapeutic medical reasons, directly intended amputations, mutilations, and sterilizations performed on innocent persons are against the moral law." CCC 2297.

**C.     Catholic teaching on abortion**

74.     The Catechism of the Catholic Church teaches that life begins at conception and that "[h]uman life must be respected and protected absolutely from the moment of conception." CCC

---

[3] Richard P. Fitzgibbons, M.D., et al., The Psychopathology of "Sex Reassignment" Surgery: Assessing its Medical, Psychological and Ethical Appropriateness, National Catholic Bioethics Quarterly 97, 100 (Spring 2009), available at www.ncbcenter.org/document.doc?id=581.

2270. Thus, "[d]irect abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law." CCC 2271.

### D. Catholic teaching on scandal

75.     Catholic moral theology prohibits acts that may give rise to "scandal." The Catechism defines scandal as "an attitude or behavior which leads another to do evil." CCC 2284. The Catechism teaches that "[a]nyone who uses the power at his disposal in such a way that it leads others to do wrong becomes guilty of scandal and responsible for the evil that he has directly or indirectly encouraged." CCC 2287. Avoiding scandal is particularly important for Catholic entities that seek to inculcate Catholic faith and values.

### E. The Ethical and Religious Directives

76.     These teachings are reflected in the Ethical and Religious Directives for Catholic Health Care Services ("Ethical and Religious Directives" or "ERDs"), a document issued by the United States Conference of Catholic Bishops in order "to reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person" and "to provide authoritative guidance on certain moral issues that face Catholic health care today." USCCB, *Ethical and Religious Directives for Catholic Health Care Services, Fifth Edition*, ¶ 4, http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf .

77.     The ERDs teach that "[d]irect sterilization of either men or women, whether permanent or temporary, is not permitted in a Catholic health care institution. Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." *Id.* ¶ 53.

78.     The ERDs teach that "Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization." *Id.* ¶ 70.

**F.     The Catholic Benefits Association's Ethics Committee**

79.     As noted above in paragraph 39, the CBA's Ethics Committee, comprised exclusively of Catholic archbishops, has the duty and responsibility to define Catholic values and doctrine on relevant issues for CBA members.

80.     In November 2016, the CBA's Ethics Committee convened to address doctrinal and ethical issues related to the ACTS Mandate. After consultation, it unanimously adopted the following resolutions:

    a.     **RESOLVED**: that treatments and services designed to alter a person's biological sex are contrary to Catholic values. A Catholic employer, therefore, cannot, consistent with Catholic values, comply with the government's mandate to include coverage in its employee health plan for treatments services designed to alter a person's biological sex.

    b.     **RESOLVED**: that treatments and services designed to alter a person's biological sex are contrary to Catholic values. A Catholic hospital, clinic, physicians practice group, or other medical provider, therefore, cannot, consistent with Catholic values, comply with the government's mandate to provide or deliver treatments or services designed to alter a person's biological sex.

    c.     **RESOLVED**: that abortion is contrary to Catholic values. A Catholic employer, therefore, cannot, consistent with Catholic values, comply with any government mandate to include coverage in its employee health plan for abortion.

    d.     **RESOLVED**: that abortion is contrary to Catholic values. A Catholic health care insurer or third party administrator, therefore, cannot, consistent with Catholic values, comply with any government abortion mandate by operating or administering a plan that provides coverage for abortion.

    e.     **RESOLVED**: that abortion is contrary to Catholic values. A Catholic hospital, clinic, physicians practice group, or other medical provider, therefore, cannot, consistent with Catholic values, comply with any government abortion mandate that requires the provision and delivery of abortion services.

81.     Consistent with the Ethics Committee's guidance, Plaintiffs and all CBA members believe they must adhere to the above teachings as matters of religious faith and doctrine. Consequently, CBA members believe that gender transition procedures, sterilization, and abortion are contrary to the Catholic faith. CBA members further believe, as part of their faith, that they must not provide, pay for, or directly or indirectly facilitate access to such services and, therefore, that they must not perform gender transition services or abortions and must not include coverage for such procedures in their group health plans.

## V.     THE ACTS MANDATE

### A.     Statutory Overview

#### 1.     Section 1557 of the Affordable Care Act

82.     On March 23, 2010, President Obama signed into law the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (Mar. 23, 2010). Days later, the President signed into law the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, 124 Stat. 1029 (Mar. 30, 2010). These two acts, together, are known as the Affordable Care Act (the "Affordable Care Act" or "ACA").

83.     Section 1557 of the ACA states that no individual can be denied certain federally-funded health benefits because of the individual's race, color, national origin, sex, age, or disability. 42 U.S.C. § 18116. However, Section 1557 does not use or define such terms. Instead, this provision refers to other, pre-existing laws that prohibit discrimination on certain bases under certain circumstances: Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (barring discrimination on the basis of race, color, or national origin), Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) (barring discrimination on the basis of sex), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.) (barring discrimination on the basis of age), or section 794 of Title 29 (the Rehabilitation Act, barring discrimination on the basis of disability).

21

84.     Title IX, 20 U.S.C. § 1681 et seq., is the only law referenced in Section 1557 that bars sex discrimination.

### 2.     Title IX of the Education Amendments of 1972

85.     Congress passed Title IX in 1972. Public Law No. 92-318, 86 Stat. 235 (June 23, 1972).

86.     Title IX states that no person "shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

87.     Title IX permits differentiation of intimate facilities by sex. 20 U.S.C. § 1686.

88.     Congress specified that Title IX may not be applied to an entity "controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3).

89.     Congress also stated that, regardless of whether an entity is religious, Title IX cannot be "construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service . . . related to an abortion." 20 U.S.C. § 1688.

90.     At the time that the ACA was enacted in 2010, no federal court and no federal agency had interpreted "sex" in Title IX to include the right to an abortion.

91.     At the time the ACA was enacted in 2010, no federal court and no federal agency had interpreted "sex" in Title IX to include gender identity.

92.     The Eighth Circuit holds that the definition of discrimination on the basis of sex under Title IX and under Title VII should be "treated interchangeably." *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 866 (8th Cir. 2011).

93.     The U.S. Department of Justice also holds that sex discrimination means substantively the same thing under Title IX and Title VII.[4]

### 3.     Title VII of the Civil Rights Act of 1964

94.     Congress enacted Title VII in 1964. Public Law 88-352, 78 Stat. 241 (July 2, 1964).

95.     Title VII makes it unlawful for an employer to discriminate against employees or prospective employees "because of such individual's . . . sex." 42 U.S.C. § 2000e-2.

96.     When Congress passed Title VII, it specified that the law does not prevent a religious organization from taking religion into account with respect to positions related to the organization's religious mission. 42 U.S.C. § 2000e-1(a). Congress also defined "religion" broadly, to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

97.     Congress enacted the Pregnancy Discrimination Act in 1978 to further define what constitutes "sex" discrimination under Title VII. It specified that the terms "because of sex" or "on the basis of sex" include "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

98.     At the same time, Congress clarified that Title VII "shall not require an employer to pay for health insurance benefits for abortion." *Id.*

99.     When Congress enacted the ACA in 2010, no federal court and no federal agency had interpreted "sex" in Title VII to include the right to an abortion.

100.     When the ACA was enacted in 2010, no federal court and no federal agency had interpreted "sex" in Title VII to include gender identity.

---

[4] U.S. Department of Justice, Civil Rights Division, *Title IX Legal Manual*, Section IV.B.2, *available at* https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/ixlegal.pdf/.

### 4. Congress has consistently rejected attempts to expand the meaning of "sex" in Title VII and Title IX.

101.    For decades, lawmakers have proposed legislation that would expand Title VII and Title IX to add the new categories of "sexual orientation" and "gender identity." The first such attempt was in 1974, and there have been dozens of such attempts since then. Congress has rejected all such attempts.

102.    In 1974, Representatives Bella Abzug and Edward Koch proposed to amend the Civil Rights Act to *add* the *new* category of "sexual orientation." H.R. 14752, 93rd Cong. (1974). Congress considered and rejected this bill and ten other similar bills during the 1970s. *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982); *Holloway v. Arthur Anderson Co.*, 566 F.2d 659, 662 n.6 (9th Cir. 1977).

103.    In 1994, lawmakers introduced the Employment Non-Discrimination Act ("ENDA") that, like Rep. Abzug and Koch's earlier effort, was premised on the understanding that Title VII's protections against invidious "sex" discrimination related only to one's biological sex as male or female. H.R. 4636, 103rd Cong. (1994). From 1994 to the present, Congress has considered and rejected twenty versions of ENDA. *See* http://bit.ly/ENDAhistory.

104.    Beginning in 2007, lawmakers have proposed a broader version of ENDA to add "gender identity" as a protected classification in the employment context. H.R. 2015, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011). In addition, in 2013 and 2015, proposals were made to *add* to Title IX the *new* category of "gender identity." H.R. 1652, 113th Cong. (2013); S.439, 114th Cong. (2015). Notwithstanding the success or failure of these congressional proposals, they all affirmed Congress's enduring understanding that "sex," as a protected class, refers only to one's biological sex, as male or female, and not the radical re-authoring of the term now being foisted on Plaintiffs and their members by the collective efforts of Defendants.

105.     When Congress redefined the term "sex" in the Pregnancy Discrimination Act to include discrimination "on the basis of pregnancy, childbirth, or related conditions," Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, § (k), 92 Stat. 2076, 2076 (1978), it indicated that "sex" discrimination occurs when females and males are not afforded the same avenues for advancement, i.e., when pregnant women may be legally fired or not hired. Thus, this amendment re-affirmed Congress's view that "sex" refers to biological sex, and not to an individual's self-perception of his or her "gender identity."

### 5.     Congress has, in other contexts, barred discrimination on the basis of gender identity.

106.     Although it has not done so under Title IX or Title VII, Congress has in *other* legislation expressed its intent to cover "gender identity" as a protected class. In 2010, President Obama signed into law hate crimes legislation, 18 U.S.C. § 249, which applies to, *inter alia*, "gender identity." *Id.* § 249(a)(2). The 2013 reauthorization of the Violence Against Women Act (VAWA) prohibits recipients of certain federal grants from discriminating on the basis of both "sex" and "gender identity." 42 U.S.C. § 13925(b)(13)(A).

107.     While Congress has added "gender identity" next to "sex" in other areas of federal law, it has not changed the terms of Title VII and Title IX.

### 6.     Anti-abortion provisions in or applicable to the Affordable Care Act

108.     The text, context, and history of the Affordable Care Act reflect clear congressional intent that no group health plan is or should be required to cover abortion.

109.     The Act provides that "[n]otwithstanding any other provision of this title (or any amendment made by this title) . . . nothing in this title (or any amendment made by this title), shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year." 42 U.S.C. § 18023(b)(1)(A)(i). The Act also

provides that "the issuer of a qualified health plan shall determine whether or not the plan provides coverage of [abortion] services . . . as part of such benefits for the plan year." *Id.* § 18023(b)(1)(A)(ii).

110.    The Affordable Care Act itself does not contain a restriction on the use of federal funds to pay for abortion services. This omission nearly defeated the Act's passage when a group of pro-life Democrats in the House of Representatives, led by Rep. Bart Stupak of Michigan, threatened to withhold their votes from the bill. To secure their votes, President Obama issued an executive order that prohibited the use of federal funds to pay for "abortion services . . . , consistent with a longstanding Federal statutory restriction that is commonly known as the Hyde Amendment." Exec. Order No. 13,535, Patient Protection and Affordable Care Act's Consistency with Longstanding Restrictions on the Use of Federal Funds for Abortion, 3 C.F.R. 201 (2010).

111.    In addition, the Weldon Amendment—a feature of every appropriations act for HHS since 2005—provides, "None of the funds made available in this Act [making appropriations for the Departments of Labor and HHS] may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011). The term "health care entity" includes "a health insurance plan." *Id.*

112.    The Affordable Care Act and the Weldon Amendment prohibit the government from coercing the consciences of healthcare providers that respect the sanctity of life. Executive Order 13,535 reflects the federal government's longstanding avoidance of coercing the consciences of taxpayers that oppose abortion and government funding of abortion services.

**B.    After Congress passed the ACA, and contrary to congressional will, federal agencies unilaterally sought to redefine sex discrimination.**

113.    For several decades, across a variety of statutes, federal agencies consistently interpreted "sex" to refer to biological differences between males and females. *See, e.g.*, A Policy Interpretation: Title IX & Intercollegiate Athletics, 44 Fed. Reg. 71,413 (Dec. 11, 1979) (listing "male and female" 28 times, "men and women" 24 times, and "men's and women's" 21 times); Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 34 C.F.R. pt. 106 (addressing expenditures for male and female teams).

114.    As late as 2008, the U.S. Department of Justice was still arguing that "the term 'sex' . . . prohibits discrimination based on the biological state of a male or female," and that "a claim based on gender identity or transsexuality fails as outside the scope of [the term 'sex']." Def.'s Post-Trial Br. at 4, *Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008) (No. 05-01090). Upon information and belief, no federal agency interpreted "sex" to include "gender identity" before 2010.

115.    But in 2010, several months *after* enactment of the ACA, federal agencies issued a rash of letters, memos, executive orders, and regulations interpreting prohibitions on "sex" discrimination to include protections for "gender identity":

116.    In July 2010, the Department of Housing and Urban Development "announced a new policy . . . treat[ing] gender identity discrimination . . . as gender discrimination under the Fair Housing Act."[5]

117.    In October 2010, the Office for Civil Rights for the Department of Education (DOE) issued a "Dear Colleague" letter asserting that, "[w]hen students are subjected to harassment

---

[5] Press Release, Shantae Goodloe, U.S. Dep't of Hous. and Urban Dev., HUD No. 10-139, *HUD Issues Guidance on LGBT Housing Discrimination Complaints* (July 1, 2010), http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2010/HUDNo.10-139.

on the basis of their LGBT status, they may also . . . be subjected to forms of sex discrimination prohibited under Title IX."[6]

118.    In February 2012, HUD issued a regulation forbidding discrimination on the basis of "gender identity" in HUD-assisted or insured housing.[7]

119.    In April 2014, DOE issued a document stating that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity."[8]

120.    In July 2014, the President amended a 50-year-old executive order by adding "gender identity" to a list of prohibited bases of discrimination in federal contracting.[9]

121.    In August 2014, the Department of Labor issued a Directive that "discrimination based on gender identity or transgender status . . . is discrimination based on sex."[10]

122.    In December 2014, the Department of Justice (DOJ) issued a memo concluding that Title VII's reference to "sex" "encompasses discrimination based on gender identity, including transgender status."[11]

---

[6] Dear Colleague Letter on Harassment and Bullying from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights (Oct. 26, 2010), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

[7] Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity, 77 Fed. Reg. 5662 (Feb. 3, 2012), https://www.regulations.gov/contentStreamer?documentId=HUD-2011-0014-0312&disposition=attachment&contentType=pdf.

[8] Catherine E. Lhamon, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

[9] Exec. Order No. 13,672, 79 Fed. Reg. 42,971 (July 21, 2014), https://www.gpo.gov/fdsys/pkg/FR-2014-07-23/pdf/2014-17522.pdf.

[10] Patricia A. Shiu, Director, U.S. Dep't of Labor, Office of Fed. Contract Compliance Programs, Directive 2014-02, Gender Identity and Sex Discrimination (2014), www.dol.gov/ofccp/regs/compliance/directives/dir2014_02.html.

[11] Mem. from the Attorney General on Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964 (Dec. 15, 2014) at 2, https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/18/title_vii_memo.pdf.

28

123.     In May 2016, DOJ and DOE issued a "Dear Colleague Letter" stating that Title IX's prohibition on "sex discrimination . . . encompasses discrimination based on a student's gender identity."[12]

124.     None of these agency actions involved a statute that used the term "gender identity."

**C.     HHS's Section 1557 Rule**

125.     On September 8, 2015, HHS proposed a new rule to "interpret" Section 1557 of the Affordable Care Act (ACA), to extend Title IX's definition of "sex" to include "gender identity," and "termination of pregnancy," among other things. 80 Fed. Reg. 54,172, 54,216 (Sept. 8, 2015).

126.     After considering comments made in response to the proposed rule, HHS published its final rule under Section 1557 on May 18, 2016. 81 Fed. Reg. 31,376 (May 18, 2016). The 1557 Rule expanded the definition even beyond the proposed rule to include an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female." *Id.* at 31,467. HHS stated in the Rule that "gender identity spectrum includes an array of possible gender identities beyond male and female," and individuals with "non-binary gender identities are protected under the rule." *Id.* at 31,392, 31,384. HHS cited as authority the "Dear Colleague" letter issued jointly by the Department of Education and Department of Justice just five days earlier.[13]

127.     The 1557 Rule also defines "sex" to include discrimination based upon "termination of pregnancy" in covered programs. 81 Fed. Reg. at 31,467; 45 C.F.R. § 92.4. HHS acknowledged that commentators had expressed concern that HHS would interpret this phrase as an abortion mandate, and that they had "urged" HHS "to state explicitly that neither Section 1557 nor the regulation imposes such a requirement." *Id.* at 31,388. HHS rejected such requests. Instead, it merely

---

[12] U.S. Dep't of Justice and U.S. Dep't of Educ., Dear Colleague Letter on Transgender Students, May 13, 2016, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

[13] U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter on Transgender Students, May 13, 2016, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

noted the existence of conscience protections in federal law and ACA limitations on requiring abortion coverage in certain contexts. *Id.*

128.    The 1557 Rule applies to a  "covered entity," defined by HHS to include all entities that operate, offer, or contract for health programs and activities that receive any Federal financial assistance from HHS. 45 C.F.R. § 92.4. In light of this sweeping application, HHS has estimated the Rule will "likely cover[] almost all licensed physicians because they accept Federal financial assistance," including payments from Medicare and Medicaid.[14] Other observers have estimated that the Rule will apply "to over 133,000 (virtually all) hospitals, nursing homes, home health agencies, and similar provider facilities, about 445,000 clinical laboratories, 1,200 community health centers, 171 health-related schools, state Medicaid and CHIP programs, state public health agencies, federally facilitated and state-based marketplaces, at least 180 health insurers that market policies through the [federally facilitated marketplace] and state-based marketplaces, and up to 900,000 physicians."[15]

129.    The 1557 Rule requires covered entities to provide health programs or activities in accordance with HHS's expansive and unwarranted definition of "sex." This includes a number of new requirements listed below.

**1.    Healthcare professionals must perform or refer for gender transition procedures.**

130.    The 1557 Rule requires covered employers, and their healthcare providers and professionals, to perform (or refer for) gender transition procedures if a physician or healthcare provider offers analogous services in other contexts. For example, "[a] provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a

---

[14] Nondiscrimination in Health Programs and Activities, 80 Fed. Reg. 54,172, 54,195 (proposed Sept. 8, 2015); 81 Fed. Reg. at 31,445.

[15] Timothy Jost, Implementing Health Reform: HHS Proposes Rule Implementing Anti-Discrimination ACA Provisions (Contraceptive Coverage Litigation Update), Health Affairs Blog (Sept. 4, 2015), http://healthaffairs.org/blog/2015/09/04/implementing-health-reform-hhs-proposes-rule-implementing-anti-discrimination-aca-provisions/.

transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." 81 Fed. Reg. at 31,455. HHS explained that a hysterectomy in this gender transition context would be "medically necessary to treat gender dysphoria," *id.* at 31,429, thereby declaring medical necessity, benefit, and prudence as a matter of federal law, and without regard to the opinions, judgment, and conscientious considerations of the many medical professionals that hold views to the contrary.

131.    HHS has issued this mandate despite the widespread, well-documented, ongoing debate about the medical risks and ethics associated with various gender transition procedures, even within the transgender community itself. In fact, HHS's own medical experts recently wrote, "Based on a thorough review of the clinical evidence available at this time, there is not enough evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria."[16] The evidence showed that "[t]here were conflicting (inconsistent) study results—of the best designed studies, some reported benefits *while others reported harms*." *Id.* (emphasis added). Yet the 1557 Rule attempts to preempt the serious medical and moral debate about gender transition procedures by concluding in the context of physicians offering "health services" that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id.* at 31,429.

132.    In creating this mandate, HHS disregarded the commenters that asked HHS to make clear that health services need only be covered if they are deemed to be "medically necessary" or "medically appropriate" in the professional opinion of those charged with the care of the patient at issue. In response to these comments, HHS stated that under its Rule, some procedures "related to gender transition" may be required even if they were not "strictly identified as medically necessary or

---

[16] Centers for Medicare & Medicaid Services, Proposed Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (June 2, 2016).

appropriate." *Id.* at 31,435. Thus, under the Rule, if a doctor would perform a mastectomy as part of a medically-necessary treatment for breast cancer, it would be illegal for the same doctor to decline to perform a mastectomy for a gender transition, even if the doctor believed that removing healthy breast tissue was contrary to the patient's medical interest.

### 2. Healthcare facilities and professionals must alter their speech and medical advice.

133.     As discussed above, HHS has concluded, in the context of physicians offering "health services," that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." *Id.* In so doing, HHS has seriously curbed a Catholic healthcare entity's ability to maintain policies and practices reflecting a contrary view, even if such a view is based on the entity's religious convictions, conscientious beliefs, and best medical judgment. This Rule thus forces Catholic healthcare providers to alter their speech and medical advice.

134.     Under the 1557 Rule, HHS compels the speech of healthcare institutions and professionals in several ways. For example, the Rule mandates revisions to healthcare providers' written policies, requiring express affirmations that gender transition-related procedures will be provided, *id.* at 31455, even if such revisions do not reflect the entity's medical judgment, values, or beliefs. Second, it requires physicians to use gender-transition affirming language in all situations regardless of circumstance, and provides as just one example the requirement that medical providers use "a transgender individual's preferred name and pronoun." *Id.* at 31,406. HHS also relies upon a transgender medical guidance document stating that "[m]ental health professionals should not impose a binary view of gender." *Id.* at 31,435. Thus, to avoid facing liability for being discriminatory under the proposed rule, healthcare providers are compelled to speak by revising their policy to endorse gender transition-related services, to express language that is affirming of gender transition, and to express a non-binary view of gender. Further, by treating as discriminatory a medical view of

32

"transition-related treatment . . . as experimental,"[17] HHS coerces CBA-member healthcare providers to speak about these procedures the way the government wants them to, even though they disagree, and even though they believe they are disserving their patients by concealing the information the government wants concealed.

### 3.    Covered employers and insurance providers must offer employee benefits covering gender transition procedures.

135.    The Rule prohibits certain employers, health programs, or insurance plans from exercising judgment as to what they cover. HHS stated, "[A]n explicit, categorical (or automatic) exclusion or limitation of coverage for all health services related to gender transition is unlawful on its face." *Id.* at 31,429.

136.    For example, if a doctor concludes that a hysterectomy "is medically necessary to treat gender dysphoria," the patient's employer or insurance plan would be required to cover the procedure on the same basis that it would cover it for other conditions (like cancer). *Id.* HHS also stated that the "range of transition-related services, which includes treatment for gender dysphoria, is not limited to surgical treatments and may include, but is not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual." *Id.* at 31435-36. As such, coverage is required under the 1557 Rule notwithstanding the rights of employers that only offer employee health benefits consistent with the religious beliefs and values of their organization.

137.    This conflict with religious employers extends beyond treatment surrounding gender dysphoria, because some required procedures (such as elective hysterectomies) result in sterilization, and the 1557 Rule also extends to "termination of pregnancy." 45 C.F.R. § 92.4.

138.    Although HHS states that laws protecting religious objections to abortion (or "termination of pregnancy") apply to its Rule, HHS reads these protections narrowly. For example,

---

[17] 81 Fed. Reg. at 31,435.

HHS recently approved California forcing all insurers to include abortion coverage, even for objecting religious institutions.[18] HHS thereby denied that the Weldon Amendment protects the rights of religious employers that wish to exclude abortion coverage from their health plans.

139.    This health benefit requirement of the 1557 Rule applies to any of the following types of employers who receive HHS funding: (1) any entity principally involved in providing or administering health services (including hospitals, nursing homes, counseling centers, physicians' offices, etc.), (2) any type of employer who receives HHS funding for the primary purpose of funding an "employee health benefit program," or (3) any entity such as a university with a health training or research program that receives HHS funding or Federal financial assistance for that "health program or activity."[19]

140.    Thus, any such employers who have always offered employee health benefits that reflect their religious or conscientious beliefs, and excluded gender transition procedures from employee benefits, will now be considered discriminatory under the Rule.

141.    Recently, CBA members have begun receiving notices from their insurance companies about how their plans will be changing as a result of the 1557 Rule. Exhibits E and F are, respectively, the gender dysphoria policies that United Healthcare and Blue Cross Blue Shield of Kansas City have delivered to CBA member dioceses. These notices reflect the manner in which covered insurance companies are interpreting HHS's Rule and show concretely how the Rule will soon begin to affect CBA members, include Catholic dioceses, that are *not* "covered entities" under the Rule.

---

[18] Letter from Jocelyn Samuels, Director of HHS Office of Civil Rights to Catherine W. Short, *et al.* (June 21, 2016 (available at: https://adflegal.blob.core.windows.net/web-content-dev/docs/default-source/documents/resources/media-resources/cdmhc-investigation-closure-letter.pdf?sfvrsn=2).

[19] *Id.* at 31,472, 45 C.F.R. § 92.208; *see also* 81 Fed. Reg. at 31,437.

### a.       United Healthcare "Gender Dysphoria Rider"

142.    This fall, a Catholic diocese that is a CBA member received communications from its health insurance company, United Healthcare, that included a "Gender Dysphoria Rider." Ex. E.

143.    The Rider informs "Enrolling Groups" that their plan will cover "Benefits for the treatment of Gender Dysphoria" and that any "exclusion for sex transformation operations and related services . . . is deleted." *Id.* at 1, 3.

144.    Under the Rider, "[b]enefits for the treatment of Gender Dysphoria" include psychotherapy, "[c]ross-sex hormone therapy," and "[s]urgery for the treatment of Gender Dysphoria." *Id.*

a.   ***Male to female surgeries*** include: clitoroplasty (creation of a clitoris), labiaplasty (creation of a labia), orchiectomy (removal of testicles), penectomy (removal of penis), vaginoplasty (creation of a vagina), and urethroplasty (reconstruction of female urethra). *Id.*

b.   ***Female to male surgeries*** include:  bilateral mastectomy or breast reduction, hysterectomy (removal of uterus), metoidioplasty (creation of penis, using clitoris), penile prosthesis, phalloplasty (creation of penis), saplingo-oopherectomy (removal of fallopian tubes and ovaries), scrotoplasty (creation of scrotum), testicular prosthesis, vulvectomy (removal of vulva), urethroplasty (construction of male urethra), and vaginectomy (removal of vagina). *Id.* at 1-2.

145.    After receiving this Rider in the mail, the CBA member diocese called its insurance company to demand that the Rider be removed from its 2017 plan.

146.    The CBA member diocese's insurance company refused, informing the diocese that its 2017 plan must include the Gender Dysphoria Rider as a result of HHS's 1557 Rule.

> **b.     Blue Cross Blue Shield of Kansas City "Treatment of Gender Dysphoria" Policy**

147.    This fall, another CBA Member Catholic diocese received communications from its health insurance company, Blue Cross Blue Shield of Kansas City, that included a "Treatment of Gender Dysphoria Policy." Ex. F.

148.    The Policy informs recipients that "[i]f coverage for gender reassignment surgery is available per the member's benefit, Blue Cross and Blue Shield of Kansas City (Blue KC) will provide coverage for treatment of gender dysphoria including gender reassignment surgery when it is determined to be medically necessary because the criteria shown below are met." *Id.* at 1.

149.    Under the Policy, plans will cover "[p]sychotherapy for gender dysphoria" and "Continuous Hormone Replacement Therapy" with "[h]ormones of the desired gender." *Id.* The following surgeries "would be considered **medically necessary** when performed as part of a medically necessary initial gender reassignment":

> initial mastectomy/breast reduction; hysterectomy; salpingo-oophorectomy; colpectomy; metoidioplasty; vaginoplasty; colovaginoplasty; orchiectomy; penectomy; clitoroplasty; labiaplasty; scrotoplasty, urethroplasty, phalloplasty, testicular implants, colovaginoplasty, cenectomy, clitoroplasty, vulvoplasty, penile skin inversion, repair of introitus, construction of vagina with graft, coloproctostomy, and urethromeatoplasty.

*Id.* at 3.

150.    After receiving this Policy in the mail, the CBA member diocese called its insurance company to see whether the Policy applied to its 2017 plan.

151.    Blue Cross Blue Shield of Kansas City informed the CBA member diocese that its Treatment of Gender Dysphoria Policy would apply to the diocese's 2017 plan as a result of HHS's 1557 Rule.

4. **Sex-specific healthcare facilities or programs, including shower facilities or hospital wards, must be opened to individuals based on gender identity.**

152.     With regard to facilities, the 1557 Rule states that even for sex-specific facilities such as "shower facilities" offered by healthcare providers, individuals may not be excluded "based on their gender identity." 81 Fed. Reg. at 31,409.

153.     When Title IX—the foundation for the 1557 Rule—was enacted, Congress ensured that it protected and preserved the privacy rights of individuals in intimate areas. *See* 20 U.S.C. § 1686, 117 Cong. Rec. 30407 (1971), 117 Cong. Rec. 39260 (1971), 117 Cong. Rec. 39263 (1971), and 118 Cong. Rec. 5807 (1972). HHS's predecessor, the Department of Health, Education, and Welfare, promulgated regulations guaranteeing the privacy of individuals in intimate areas. *See* 34 C.F.R. § 106.32(b); 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex . . . ."). But HHS wholly disregarded any "legal right to privacy" that could be violated "simply by permitting another person access to a sex-specific program or facility which corresponds to their gender identity." 81 Fed. Reg. at 31,389, 31,409.

154.     With regard to other health programs, HHS stated that sex-specific health programs or activities are allowable only where the covered entity can demonstrate "an exceedingly persuasive justification, that is, that the sex-specific program is substantially related to the achievement of an important health-related or scientific objective." *Id.* at 31,468. HHS stated that it "will expect a covered entity to supply objective evidence, and empirical data if available, to justify the need to restrict participation in the program to only one sex," and in "no case will [HHS] accept a justification that relies on overly broad generalizations about the sexes." *Id.*

5. **Covered entities must provide assurances of compliance.**

155.     HHS now requires that covered entities applying for federal financial assistance affirm up front that they will comply with HHS's 1557 Rule. *Id.* at 31,468; 45 C.F.R. § 92.5. The

HHS-690 Form, which now references Section 1557, now requires applicants to certify that "no person in the United States shall, on the ground of . . . sex . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any health program or activity for which the Applicant receives Federal financial assistance from the Department."[20]

### 6.   Covered entities must post notices of compliance.

156.   The Rule also requires covered entities to post notices regarding compliance with the Rule in conspicuous locations by October 16, 2016 (90 days from the effective date). HHS provided a sample notice in Appendix A to the 1557 Rule, which states in relevant part that the covered entity "does not exclude people or treat them differently because of race, color, national origin, age, disability, or sex."[21]

### 7.   Covered entities must train their employees on the 1557 Rule.

157.   Covered entities will be required to train employees on the requirements of the 1557 Rule. *See* 81 Fed. Reg. at 31,452, 31,458-59. This training mandate creates ethical challenges, notably a compelled speech problem, for CBA members in the healthcare field.

158.   HHS estimates that covered entities will have to spend $371.7 million dollars to train their employees on the requirements in the 1557 Rule. 81 Fed. Reg. at 31,452.

### D.   HHS rejected calls to accommodate religious exercise in its 1557 Rule.

159.   HHS was well aware that its ACTS Mandate would substantially burden the religious exercise of countless religious hospitals, churches, ministries, and other employers. *See id.* at 31,378.

160.   During the comment period, many religious organizations voiced their alarm at the scope of HHS's proposed rule and explained why it was essential for HHS to include adequate

---

[20] HHS, *Assurance of Compliance*, https://www.hhs.gov/sites/default/files/hhs-690.pdf.

[21] 81 Fed. Reg. at 31,472, 45 C.F.R. § 92, App. A, https://www.federalregister.gov/articles/2016/05/18/2016-1458/nondiscrimination-in-health-programs-and-activities#h-139.

protections for religious employers and healthcare organizations. For example, the United States Conference of Catholic Bishops joined with the National Association of Evangelicals, the Christian Medical Association, the National Catholic Bioethics Center, and other religious organizations to submit comments explaining how HHS's proposed rules would affect religious employers and urging HHS to protect religious exercise. *See* Comments from USCCB et al., *supra*, ¶ 64 n.2.

161.    Section 1557 does not independently prohibit discrimination, but instead references four preexisting laws: Title VI, Title IX, the Age Discrimination Act, and the Rehabilitation Act. *See supra*, ¶ 83.

162.    HHS faithfully incorporated the exemptions applicable to Title VI, the Age Discrimination Act, and the Rehabilitation Act into its Final Rule. 81 Fed Reg. at 31,470; 45 C.F.R. § 92.101(c) (emphasis added):

> The exceptions applicable to Title VI **apply** to discrimination on the basis of race, color, or national origin under this part. The exceptions applicable to Section 504 **apply** to discrimination on the basis of disability under this part. The exceptions applicable to the Age Act **apply** to discrimination on the basis of age under this part.

163.    However, when it came to Title IX, HHS changed course. Unlike its treatment of the other four statutes cited in Section 1557, HHS refused to incorporated Title IX's religious exemption. 81 Fed. Reg. at 31,380.

164.    Instead of incorporating Title IX's religious exemption or otherwise recognizing the burden that its rule would place on religious healthcare providers and other religious employers, HHS merely stated that religious objectors could assert claims under existing statutory protections for religious freedom. *Id.* at 31,376. But HHS also failed to provide any mechanism by which a religious entity could determine if it was entitled to any existing religious protections under the law.

165.    The ACTS Mandate is, in this regard, even more extreme and unyielding than the contraception and abortifacient mandate that HHS has created based on another section of the

Affordable Care Act. *See Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 933-35 (8th Cir. 2015) (describing HHS's contraceptive and abortifacient mandate).

166.    While HHS reluctantly decided to exempt a narrowly defined group of "religious employers" from its abortifacient and contraception mandate, *id.* at 933, it declined to exempt *any* religious employers from the ACTS Mandate.

167.    Many non-exempt religious employers avoid HHS's contraception and abortifacient mandate (though at substantial cost) by maintaining a grandfathered group health plan. *Id.* There is no grandfathered group plan exemption from the ACTS Mandate.

**E.    The EEOC, invoking Title VII, will impose many of the requirements of the 1557 Rule against non-covered entities.**

168.    Although the HHS 1557 Rule only applies directly to "covered entities," the 1557 Rule repeatedly announces EEOC's policy to enforce a similarly broad definition of sex discrimination against other employers under Title VII. The 1557 Rule declares, "Where . . . [HHS] lacks jurisdiction over an employer . . . , [HHS] typically will refer or transfer the matter to the EEOC and allow that agency to address the matter." *Id.* at 31,432. When Section 1557 does not apply, similar claims can be brought against employers under Title VII.  *Id.* at 31,404.  HHS has decided that, for non-healthcare entities, Title VII is better suited to "address claims that an employer has discriminated in the provision of benefits, including health benefits, to its employees." *Id.* at 31,437.

169.    The EEOC has already confirmed to HHS it will cooperate in such matters, indicating that "the date a complaint was filed with [HHS] will be deemed the date it was filed with the EEOC." *Id.* at 31,432

170.    In the context of Title VII, EEOC has adopted similar substantive standards as HHS. EEOC "interprets [Title VII's] sex discrimination provision as prohibiting discrimination against employees on the basis of sexual orientation and gender identity." EEOC, *What You Should*

40

*Know About EEOC & the Enforcement Protections for LGBT Workers*, ("EEOC Statement")

https://www.eeoc.gov/eeoc/newsroom/wysk/enforcement_protections_lgbt_workers.cfm.

  171. In December 2012, EEOC adopted its Strategic Enforcement Plan for fiscal years

2013-2016 ("2013 SEP"). Among other things, EEOC expressly prioritized "coverage of lesbian,

gay, bisexual and transgender individuals under Title VII's sex discrimination provisions." EEOC,

*Strategic Enforcement Plan FY 2013-2016*, https://www.eeoc.gov/eeoc/plan/sep.cfm.

  172. Pursuant to the 2013 SEP, EEOC began to aggressively advance its interpretation

that "sex" includes "gender identity" through litigation. *See* EEOC, *Fact Sheet: Recent EEOC Litigation*

*Regarding Title VII & LGBT-Related Discrimination*, https://www.eeoc.gov/

eeoc/litigation/selected/lgbt_facts.cfm. EEOC brought numerous enforcement actions directly

against employers based on alleged discrimination against transgender employees.[22] It also filed

amicus briefs in several cases advancing the position that discrimination on the basis of sex includes

discrimination based on gender identity.[23] For example, in *Eure v. Sage Corp.*, EEOC argued to the

Fifth Circuit that Title VII bars discrimination based on "nonconformance with a sex stereotype or

norm" and therefore that "transgender discrimination is cognizable under Title VII." Br. of EEOC

as Amicus Curiae at 12, 14, *Eure v. Sage Corp.*, No. 14-51311 (5th Cir.) (filed Apr. 22, 2015).

---

[22] *EEOC v. Bojangles Rests., Inc.*, Civ. No. 5:16-cv-00654-BO (E.D.N.C. filed July 6, 2016); *EEOC v. R.G. & G.R. Harris Funeral Homes Inc.*, Civ. No. 2:14-cv-13710-SFC-DRG (E.D. Mich. filed Sept. 25, 2014); *Broussard v. First Tower Loan LLC*, Civ. No. 2:15-cv-01161-CJB-SS (E.D. La.) (court granted EEOC's motion to intervene on Sep. 17, 2015); *EEOC v. Deluxe Fin. Servs. Corp.*, Civ. No. 0:15-cv-02646-ADM-SER (D. Minn. filed June 4, 2015); *EEOC v. Lakeland Eye Clinic, P.A.*, Civ. No. 8:14-cv-2421-T35 AEP (M.D. Fla. filed Sep. 25, 2014);

[23] *Dawson v. H & H Elec., Inc.*, No. 4:14cv00583 SWW ((E.D. Ark.) (amicus brief filed June 26, 2015); *Eure v. Sage Corp.*, No. 14-51311 (5th Cir.) (amicus brief filed Apr. 22, 2015); *Jamal v. Saks & Co.*, No. 4:14-cv-02782 (S.D. Tex.) (amicus brief submitted on Jan. 22, 2015); *Lewis v. High Point Reg'l Health Sys.*, No. 5:13-cv-838-BO (E.D.N.C.) (amicus brief filed Oct. 30, 2014); *Chavez v. Credit Nation Auto Sales, LLC*, No. 1:13-cv-0312 (N.D. Ga.) (amicus brief filed June 5, 2014); *Pacheco v. Freedom Buick GMC Truck, Inc.*, No. 7:10-cv-00116 (W.D. Tex.) (amicus brief submitted on Oct. 17, 2011).

100021819_11

173.   EEOC recently updated its Strategic Enforcement Plan for fiscal years 2017-2021. "Protecting lesbians, gay men, bisexuals and transgender (LGBT) people from discrimination based on sex" continues to be a top priority. EEOC, Strategic Enforcement Plan Fiscal Years 2017-2021, https://www.eeoc.gov/eeoc/plan/sep-2017.cfm.

174.   Dignity Health is one of the largest healthcare systems in the United States.  It has many Catholic hospitals.  In June 2016, Josef Robinson, a transgender male, sued Dignity Health for maintaining an employee health plan that categorically excluded coverage for gender transition services. Robinson's complaint asserted a violation of Title VII, claiming that "[d]iscrimination on the basis of transgender status or gender nonconformity is discrimination on the basis of 'sex' under Title VII," and that the hospital's exclusion of transgender surgery constituted a violation of Section 1557 of the Affordable Care Act. EEOC filed an amicus brief in the case in support of Robinson, arguing that Robinson "has been denied access to medically necessary treatment for his gender dysphoria, a serious health condition directly related to the fact that he is transgender." Br. of EEOC as Amicus Curiae at 4, *Robinson v. Dignity Health*, 16-cv-03035 YGR (N.D. Cal.) (filed Aug. 22, 2016). Accordingly, EEOC argued, Robinson was a victim of "sex discrimination" under Title VII. *See id.* at 12-13.

### F.     The ACTS Mandate's enforcement mechanisms

175.   CBA members that do not comply with the ACTS Mandate may face enforcement actions initiated by federal agencies or by individuals who allege they have been discriminated against.

176.   Catholic entities that are "covered entities" under the 1557 Rule are subject to enforcement actions brought by HHS's Office of Civil Rights ("OCR"). If the Director of OCR concludes that a covered entity has discriminated on the basis of "gender identity" or "termination of pregnancy," the Director may require the entity to take "remedial action . . . to overcome the

effects of the discrimination." 81 Fed. Reg. at 31,468; 45 C.F.R. § 92.6(a). These remedial actions will be directed at the individual who HHS determines was discriminated against. If the covered entity refuses to take "remedial action" to OCR's satisfaction, OCR may initiate an administrative procedure to terminate the entity's HHS funding. *Id.* at 31,472, 31,439; 45 C.F.R. § 92.301.

177.     OCR also has the power to compel covered entities to record and submit compliance reports under Section 1557. 81 Fed. Reg. at 31,439, 31,472; 45 C.F.R. § 92.301.

178.     As indicated above, where HHS finds it does not have jurisdiction over an alleged discriminatory act, it will refer the matter to the EEOC for enforcement under Title VII. Similar to HHS's authority under Section 1557, the EEOC has authority to investigate alleged Title VII violations and will ask violators to voluntarily take corrective action for the discriminatory behavior. 42 U.S.C. § 2000e-5(a).

179.     If HHS or the EEOC is dissatisfied with the Catholic employer's corrective remedial actions, they may refer the matter to the Department of Justice with a recommendation that it bring a federal lawsuit to enforce federal civil rights laws. *See, e.g.*, 81 Fed. Reg. at 31,439, 31,440.

180.     Section 1557 and Title VII also each create a private right of action. This means that individuals who believe they have been discriminated against on the basis of gender identity may bring their own federal lawsuits. *See, e.g., id.* These laws can also be enforced by class action suits.

181.     The sanctions for failing to comply with the ACTS Mandate are severe. They include compensatory damages, punitive damages, treble damages, civil penalties, attorney fees, injunctive relief, and even loss of federal funding. For some Catholic entities, their very existence may be at stake.

182.   *Loss of federal funding*: Catholic healthcare entities subject to the 1557 Rule risk the denial or discontinuance of federal funding if they do not comply.[24] As noted above, covered entities are required to submit HHS Form 690, which says that compliance is "a condition of continued receipt of Federal financial assistance" and authorizes the government "to seek judicial enforcement of this assurance."

183.   *Civil and criminal penalties and treble damages*: Covered entities that submit HHS Form 690 but do not comply with the 1557 Rule may be liable under the False Claims Act, which authorizes a civil penalty of up to $11,000 for each false claim, "plus 3 times the amount of damages which the Government sustains because of" the false claim.[25] False claims related to a health program may also subject responsible persons to fines and up to five years imprisonment under 18 U.S.C. § 1035.

184.   *Compensatory damages*: Catholic employers that violate the ACTS Mandate may be subject to compensatory damages under Section 1557 or under Title VII. 81 Fed. Reg. at 31,472 ("The enforcement mechanisms available for and provided under . . . Title IX . . . shall apply for purposes of Section 1557."); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992) (compensatory damages available under Title IX); 42 U.S.C. §1981a(b)(3) (compensatory damages available under Title VII). Compensatory damages may include pecuniary losses and even nonpecuniary losses such as "emotional pain" and "mental anguish." 42 U.S.C. § 1981a(b)(3); *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 954 (7th Cir. 1998).

185.   *Punitive damages*: Punitive damages are available under Title VII if the employer acted "with malice or with reckless indifference to the federally protected rights" of an employee. 42

---

[24] 81 Fed. Reg. at 31,472, 45 C.F.R. § 92.301 ("The enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964 . . . shall apply for purposes of Section 1557.")

[25] 31 U.S.C. § 3729(a)(1); Dep't of Justice, The False Claims Act: A Primer, https://www.justice.gov/sites/default/files/civil/legacy/2011/04/22/C-FRAUDS_FCA_Primer.pdf.

U.S.C. § 1981a(b)(1). Punitive damages are subject to the same statutory caps that are imposed for nonpecuniary losses. *See id.* § 1981a(b)(3).

186. _Injunctive relief_: Courts may order broad forms of injunctive relief under Title VII, *see* 42 U.S.C. §2000e-5(g)(1); *United States v. Criminal Sheriff, Parish of Orleans*, 19 F.3d 238, 239 (5th Cir. 1994), and may even mandate that employers adopt certain policies, *see, e.g.*, *Morris v. Am. Nat'l Can Corp.*, 730 F. Supp. 1489, 1498 (E.D. Mo.1989), *aff'd in part, rev'd in part on other grounds*, 941 F.2d 710 (8th Cir. 1991); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486 (M.D. Fla. 1991). Title IX, and hence Section 1557, also permit broad injunctive relief. *See Roberts v. Colo. State Bd. of Agriculture*, 998 F.2d 824, 826 (10th Cir. 1993).

187. _Attorney's fees_: Under Title VII and Section 1557, a prevailing party is entitled to costs and attorney's fees. *See* 42 U.S.C. § 2000e-5(k); *id.* § 1988(b).

## VI.    The ACTS Mandate burdens the religious exercise of the CBA and its members

188. Although the Section 1557 Final Rule applies directly only to "covered entities," the ACTS Mandate the Rule creates is much broader, impacting all Catholic employers.

189. The decisions of CBA members to refuse to cooperate in their patients', employees', or plan beneficiaries' efforts to undergo gender transition procedures qualify as the exercise of religion.

190. The decisions of CBA members to refuse, for religious reasons, to cooperate in their patients', employees', or plan beneficiaries' efforts to obtain an abortion qualify as the exercise of religion.

### A.    ACTS Mandate's effects on CBA members that are covered entities – medical services

191. The ACTS Mandate's regulatory scheme makes it virtually impossible for CBA members that qualify as a "covered entity" to continue their healthcare ministries. Their options are: (1) provide gender transition services, (2) cease providing any services that HHS may correlate with

45

gender transition, (3) continue to meet patients' needs but refuse to provide gender transition services, (4) stop participating in all HHS-related programs, including Medicaid and Medicare; and (5) cease providing health services and activities.

192.    Option 1, directly providing gender transition and abortion services, is contrary to Catholic values and would give rise to scandal.

193.    Directly providing gender transition services is contrary to Catholic values.

194.    This situation gives rise to scandal and the loss of members' reputation because patients, employees, and the larger community would perceive that CBA-member healthcare providers profess one thing but do another. Such scandal devastates ministry.

195.    Option 2, ceasing providing any services that HHS may correlate with gender transition and abortion, would be ruinous for covered entity CBA members and their patients.

196.    In order to avoid the ACTS Mandate, CBA members could refuse to perform any procedure that might be used as part of a gender transition, such as hysterectomies, mastectomies, hormone treatments, and plastic surgery.

197.    Doing so would prevent these CBA members from being able to use such procedures to address medical illnesses or conditions—such as uterine cancer, breast cancer, menopause, and miscarriage—thus injuring their healing ministries.

198.    Artificially restricting their medical services in this manner would cause these CBA members to incur financial losses, lose valuable employees, and suffer other injuries.

199.    Absent injunctive relief from this Court, option 3 is ruinous because it would expose covered entity CBA members to HHS and EEOC enforcement actions and other penalties as described above.

200.    Option 4, stopping participation in HHS-related programs, including Medicaid and Medicare, would severely penalize CBA members for maintaining their religious convictions. This

100021819_11

would also require them to severely curtail their services to the poor, disabled, and the elderly, thus injuring their healing ministries.

201.    Option 5, ceasing their health services and activities, would burden CBA members' religious exercise.

### B.    ACTS Mandate's effects on CBA members that are covered entities – insurance coverage

202.    The ACTS Mandate also affects covered entities' ability to offer their employees health benefits that reflect their Catholic values. Their options are: (1) provide a group health plan that includes coverage for gender transition and abortion services, (2) provide a group health plan that excludes coverage for gender transition and abortion services, or (3) cease providing health coverage.

203.    Option 1, providing a group health plan that covers gender transition and abortion services, is contrary to Catholic values and would give rise to scandal.

204.    Absent injunctive relief from this Court, option 2 is ruinous because it would expose covered entity CBA members to HHS and EEOC enforcement actions and other penalties as described above in paragraphs 175 to 187.

205.    Option 3, dropping health benefits, would burden CBA members' exercise of religion because:

      a.    Catholic values commend providing just compensation and benefits supportive of family values, including, whenever possible, health care;

      b.    Eliminating health insurance for employees subjects CBA members to annual excise taxes of $2,000 per employee after the first 30 employees, 26 U.S.C. § 4980H(a), (c)(1); and

c. Eliminating health insurance would put CBA members at a significant disadvantage in the market for recruiting the best workers and thereby harm the operation of their ministries.

### C. ACTS Mandate's effects on insured CBA members

206. The ACTS Mandate also injures CBA members who are not covered entities, and are thus not directly regulated by the 1557 Rule. Regardless whether a CBA member is a covered entity, the ACTS Mandate restricts its ability to acquire a group health plan that reflects Catholic values. This is because group insurers are covered entities that are required, under the 1557 Rule, to cover both transgender services and abortion.

207. **For CBA members that sponsor an insured group plan**, their options are: (1) provide a group health plan that includes coverage for gender transition and abortion services, (2) provide a group health plan that excludes coverage for gender transition and abortion services, or (3) cease providing health coverage.

208. Option 1, providing a group health plan that covers gender transition and abortion services is contrary to Catholic values and would give rise to scandal.

209. Defendants' ACTS Mandate has made option 2, providing a group health plan that excludes gender transition and abortion services, either impossible or unduly burdensome.

210. Insured CBA members have been told by their insurers that, as a direct result of the 1557 Rule, their 2017 plan must include gender transition coverage. Insurers may also conclude that the 1557 Rule requires plans to include abortion coverage.

211. Absent injunctive relief from this Court, even if a non-covered entity CBA member were able to secure a morally compliant insured plan, option 2 is ruinous because it would expose CBA members to EEOC enforcement actions and other penalties as described above in paragraphs 175 to 187.

212.    Option 3, dropping health benefits, would burden CBA members' exercise of religion as described above in paragraph 205.

### D.    ACTS Mandate's effects on self-insured CBA members

213.    The ACTS Mandate also injures CBA members who have a self-insured employee group health plan. For CBA members that sponsor a self-insured group health plan, their options are: (1) provide a group health plan that includes coverage for gender transition services, (2) provide a group health plan that excludes coverage for gender transition services, or (3) cease providing health coverage.

214.    Option 1, providing a group health plan that covers gender transition services, is contrary to Catholic values and would give rise to scandal.

215.    Defendants' ACTS Mandate has made option 2, providing a group health plan that excludes gender transition and abortion coverage, either impossible or unduly burdensome.

216.    Self-insured CBA members have been told by their TPAs that they will not administer a 2017 plan that categorically excludes all gender transition coverage unless the CBA member agrees to indemnify the TPA. TPAs may also find that the 1557 Rule compels them to seek an indemnification agreement before excluding abortion coverage.

217.    Absent injunctive relief from this Court, even if a non-covered entity CBA member were able to secure a morally compliant self-insured plan, option 2 is ruinous because it would expose members to EEOC enforcement actions and other penalties as described above in paragraphs 175 to 187.

218.    Option 3, dropping healthcare benefits, would burden CBA members' exercise of religion as described above in paragraph 205.

## VII.   URGENT NEED FOR RELIEF

219.   The ACTS Mandate applies to group health plans on the first plan year renewal beginning on January 1, 2017. Many CBA members have plan renewal years beginning on January 1, 2017. On that date, CBA members must include gender transition services in their sponsored health plans or else risk enforcement actions, civil lawsuits, and other penalties.

220.   Insured CBA members have been notified by their insurance providers that upon renewal their sponsored health plan will include a gender dysphoria policy as a direct result of the ACTS Mandate. *See* Exs. E and F.

221.   As a direct result of the ACTS Mandate, several self-insured CBA members have been notified by their TPAs that they must indemnify their TPA, and thus take on a considerable contingent liability, in order to maintain their exclusion of all gender transition coverage.

222.   CBA members that are covered entities are currently threatened by the ACTS Mandate with administrative investigations, civil lawsuits, and various penalties if they continue to offer health services in a manner that reflect their Catholic convictions.

223.   All CBA members are currently threatened by the ACTS Mandate with administrative investigations, civil lawsuits, and various penalties if they continue to offer employee health benefits in a manner that reflect their Catholic convictions.

## VIII.   CAUSES OF ACTION

### <u>COUNT I</u>

### Violation of the Administrative Procedure Act
### Agency Action Not in Accordance with Law

224.   Plaintiffs incorporate by reference all preceding paragraphs.

225.   Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and both the 1557 Rule and the EEOC Statement complained of herein constitute "rules" under the APA, *id.* § 551(4),

and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," *id.* § 704.

226.    The APA prohibits agency actions that are "not in accordance with law." *Id.* § 706(2)(A). The 1557 Rule and the EEOC Statement are not in accordance with law for a number of independent reasons.

227.    The 1557 Rule will require physicians to perform gender transition procedures regardless of whether those procedures are "medically necessary" or "medically appropriate." It is not in accordance with law for HHS to require medical professionals to perform procedures that may not be necessary or appropriate, and may in fact be harmful to the patients.

228.    The 1557 Rule also states that a physician's view of gender transition procedures as "experimental" is "outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id.* at 31,429. It is not in accordance with law for HHS to dictate appropriate medical views on the necessity and experimental nature of gender transition procedures, and to dictate what constitutes best standards of care in an area of science and medicine that is being hotly debated in the medical community.

229.    The 1557 Rule is not in accordance with Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) or Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. Neither Section 1557 nor Title IX uses the term "sex" to include "gender identity." HHS's attempt to expand the definition is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

230.    The EEOC Statement is not in accordance with Title VII. Title VII does not use the term "sex" to include "gender identity." EEOC's attempt to expand the definition is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

231.    HHS's failure to include in the 1557 Rule a religious exemption that parallels the religious exemption in Title IX is also not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

232.    HHS's failure to include an exclusion for sterilization and sterilization-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b), which protect the right of healthcare entities who receive federal funding to refuse to participate in or assist with sterilizations.

233.    HHS's failure to include an exclusion for abortion and abortion-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with: (a) the plain language of Title IX, which prohibits requiring coverage, payment, or the use of facilities for abortion; (b) the Church Amendments, 42 U.S.C. §300a-7(b), which protect the right of healthcare entities who receive federal funding to refuse to participate in or assist with abortions; (c) Section 245 of the Public Health Service Act, 42 U.S.C. § 238(n), which prohibits the federal government from discriminating against any healthcare entity on the basis that the entity refuses to perform abortions, provide referrals for abortions, or to make arrangements for such abortions; (d) the Weldon Amendment, which has been readopted or incorporated by reference in every HHS appropriations act since 2005, and provides that no funds may be made available under HHS appropriations act to a government entity that discriminates against an institution or individual physician or healthcare professional on the basis that the entity or individual "does not provide, pay for, provide coverage of, or refer for abortions"; and (e) Section 1303(b)(4) of the ACA, 42 U.S.C. § 18023(b)(4), which states that "[n]o qualified health plan offered through an Exchange may discriminate against any individual healthcare provider or healthcare facility because of its unwillingness to provide, pay for, provide coverage of, or refer for abortions."

234.    The ACTS Mandate is not in accordance with Title VII, which requires CBA members to reasonably accommodate their employees' religious practices, because the ACTS Mandate will make it illegal for CBA members who receive HHS funds to accommodate their employees' religious objections to providing gender transition procedures.

235.    The 1557 Rule also forces physicians to provide medical services related to gender transition. This is not in accordance with substantive due process rights protecting a medical professional's right to not perform a procedure he or she believes to be experimental, ethically questionable, and potentially harmful.

236.    The 1557 Rule is not in accordance with law because it violates the First Amendment, Fifth Amendment, and the Religious Freedom Restoration Act, as hereafter described.

237.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

238.    Plaintiffs have no adequate remedy at law.

239.    Absent injunctive and declaratory relief against the Regulation, Plaintiffs have been and will continue to be harmed.

## COUNT II

### Violation of the Administrative Procedure Act
### Agency Action In Excess of Statutory Authority and Limitations

240.    Plaintiffs incorporate by reference all preceding paragraphs.

241.    The APA prohibits agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). The 1557 Rule and the EEOC Statement are in excess of statutory jurisdiction, authority, and limitations for a number of reasons.

242.    For the reasons described above, there is no statutory authority or jurisdiction for HHS to require medical professionals and facilities to perform procedures (or refer for the same) that may not be necessary or appropriate, and may in fact be harmful to the patients.

243.    For the reasons described above, there is no statutory authority or jurisdiction for HHS to dictate appropriate medical views on the necessity and experimental nature of gender transition procedures, or to dictate what constitutes best standards of care in an area of science and medicine that is being hotly debated in the medical community.

244.    For the reasons described above, HHS's decision to interpret Section 1557's reference to "sex" discrimination to include "gender identity" is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

245.    For the reasons described above, EEOC's decision to interpret Title VII's reference to "sex" discrimination to include "gender identity" is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

246.    For the reasons described above, HHS's failure to include a religious exemption in the Regulation that parallels the religious exemption in Title IX is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

247.    For the reasons discussed above, HHS's failure to include an exclusion for sterilization and sterilization-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b).

248.    For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with: (a) the plain language of Title IX, which prohibits requiring coverage, payment, or the use of facilities for abortion; (b) the Church Amendments, 42 U.S.C. § 300a-7(b); (c) Section 245 of the Public Health Service Act, 42 U.S.C. § 238(n); (d) the Weldon Amendment, which has been readopted or incorporated by reference in every HHS appropriations act since 2005; and (e) Section 1303(b)(4) of the ACA, 42 U.S.C. § 18023.

54

249.     For the reasons described above, HHS's decision to require CBA members to act in violation of Title VII by not accommodating their employees' religious and conscientious objections to participating in (or referring for) gender transition treatment or procedures is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

250.     For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as it violates the First Amendment, Fifth Amendment, and the Religious Freedom Restoration Act, as hereafter described.

251.     Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

252.     Plaintiffs have no adequate remedy at law.

253.     Absent injunctive and declaratory relief against the Regulation, Plaintiffs have been and will continue to be harmed.

## COUNT III

### Violation of the Administrative Procedure Act
### Agency Action that is Arbitrary, Capricious and an Abuse of Discretion

254.     Plaintiffs incorporate by reference all preceding paragraphs.

255.     The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The 1557 Rule is arbitrary and capricious agency action for a number of reasons.

256.     For the reasons described above, it is arbitrary and capricious for HHS to require medical professionals to perform (or refer for) procedures that the physician believes may not be necessary or appropriate, and that may even be harmful to the patient.

257.     For the reasons discussed above, it is arbitrary and capricious for HHS to dictate appropriate medical views on the necessity and experimental nature of gender transition procedures, and to dictate what constitutes best standards of care.

258.    For the reasons discussed above, HHS's inclusion of "gender identity" in its interpretation of "sex" is an arbitrary and capricious interpretation of Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

259.    For the reasons discussed above, EEOC's inclusion of "gender identity" in its interpretation of "sex" is an arbitrary and capricious interpretation of Title VII.

260.    For the reasons discussed above, HHS's failure to include a religious exemption in the 1557 Rule that parallels the religious exemption in Title IX is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

261.    For the reasons discussed above, HHS's failure to include an exclusion for sterilization and sterilization-related services is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b).

262.    For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

263.    For the reasons described above, HHS's decision to require Plaintiffs to act in violation of Title VII by not accommodating their employees' religious objections to participating in gender transition procedures is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

264.    For the reasons discussed above, the 1557 Rule is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) as it violates the First Amendment, Fifth Amendment, and Religious Freedom Restoration Act as hereafter described.

265.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

266.    Plaintiffs have no adequate remedy at law.

267.    Absent injunctive and declaratory relief against the 1557 Rule, Plaintiffs have been and will continue to be harmed.

## COUNT IV

### Violation of the First Amendment of the United States Constitution
### Freedom of Speech
### Compelled Speech and Compelled Silence

268.    Plaintiffs incorporate by reference all preceding paragraphs.

269.    CBA members plan to continue using their best medical and ethical judgment in treating and advising patients. Performing (or referring for) gender transition procedures is contrary to their best medical and/or ethical judgment.

270.    The 1557 Rule states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id.* at 31,429.

271.    The 1557 Rule would prohibit CBA members from expressing their professional opinions that gender transition procedures are not the best standard of care or are experimental.

272.    The 1557 Rule would also require CBA members to amend their written policies to expressly endorse gender transition procedures, even if such revisions do not reflect the medical judgment, values, or beliefs of CBA members. *Id.* at 31455. The 1557 Rule would also require CBA members to use gender-transition affirming language in all situations, regardless of circumstance. *Id.* at 31406.

273.    Performing (or referring for) gender transition procedures is also contrary to the religious and conscientious beliefs of CBA members, and their beliefs prohibit them from conducting, participating in, or referring for such procedures.

274.    The 1557 Rule would compel CBA members to conduct, participate in, refer for, or otherwise facilitate gender transition procedures.

275.    The 1557 Rule would prohibit CBA members from expressing their religious views that gender transition procedures are not the best standard of care or are experimental.

276.    The 1557 Rule would compel CBA members to speak in ways that they would not otherwise speak.

277.    The 1557 Rule thus violates CBA members' right to be free from compelled speech as secured to them by the First Amendment of the United States Constitution.

278.    The 1557 Rule's compelled speech requirement is not justified by a compelling governmental interest.

279.    Even if HHS has a compelling government interest, the 1557 Rule is not narrowly tailored to achieve that interest.

280.    Absent injunctive and declaratory relief against the 1557 Rule, the CBA and its members have been and will continue to be harmed.

### COUNT V

**Violation of the First Amendment of the United States Constitution
Freedom of Speech and Free Exercise Clause
Viewpoint Discrimination**

281.    Plaintiffs incorporate by reference all preceding paragraphs.

282.    CBA members' sincere religious and conscientious beliefs prohibit them from facilitating or participating in gender transition procedures.

283.    CBA members' medical judgment is that it is harmful and unethical to encourage a patient to undergo gender transition procedures.

284.    The 1557 Rule states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment, for example as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id.* at 31,429.

58

285.     The 1557 Rule would prohibit CBA members from expressing their religious or conscientious viewpoint that gender transition procedures are not the best standard of care.

286.     The 1557 Rule withholds funding based on an intent to restrict CBA members' speech.

287.     The 1557 Rule's viewpoint discrimination is not justified by a compelling governmental interest.

288.     Even if HHS has a compelling government interest, the 1557 Rule is not narrowly tailored to achieve that interest.

289.     Defendants' actions thus violate CBA members' rights as secured to them by the First Amendment of the United States Constitution.

290.     Absent injunctive and declaratory relief against the 1557 Rule, the CBA and its members have been and will continue to be harmed.

## COUNT VI

### Violation of the First and Fifth Amendments of the United States Constitution
### Freedom of Speech and Due Process
### Overbreadth

291.     Plaintiffs incorporate by reference all preceding paragraphs.

292.     The 1557 Rule regulates protected speech. The 1557 Rule states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id.* at 31,429.

293.     This exposes CBA members to penalties for expressing their medical and moral views of gender transition procedures. It also prohibits CBA members from using their medical judgment to determine the appropriate standard of care for interactions with their patients.

294.     CBA members believe that the 1557 Rule restricts their speech regarding the best standard of care for patients.

295.     The 1557 Rule states: "The determination of whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent." *Id.* at 31,377.

296.     The 1557 Rule chills CBA members' speech.

297.     The 1557 Rule's overbreadth is not justified by a compelling governmental interest.

298.     Even if HHS has a compelling government interest, the 1557 Rule is not narrowly tailored to achieve that interest.

299.     Defendants have therefore violated CBA members' rights secured to them by the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment by prohibiting speech that would otherwise be protected.

300.     Absent injunctive and declaratory relief against the 1557 Rule, the CBA and its members have been and will continue to be harmed.

## COUNT VII

**Violation of the First and Fifth Amendments of the United States
Constitution
Freedom of Speech and Due Process
Void for Vagueness**

301.     Plaintiffs incorporate by reference all preceding paragraphs.

302.     The 1557 Rule requires that a covered entity apply "neutral, nondiscriminatory criteria that it uses for other conditions when the coverage determination is related to gender transition" and "decline[s] to limit application of the rule by specifying that coverage for the health services addressed in § 92.207(b)(3)-(5) must be provided only when the services are medically necessary or medically appropriate." 81 Fed. Reg. at 31,435.

60

303.    Without allowing CBA members to use their judgment about what is medically necessary or appropriate, the 1557 Rule is ambiguous in the types of services CBA members are required to provide and perform.

304.    Requiring a CBA member to apply "neutral, nondiscriminatory criteria that it uses for other conditions" is a subjective standard without a limiting construction. *Id.*

305.    The 1557 Rule states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment, for example as experimental, is outdated and not based on current standards of care." *Id.*; *see also id.* at 31,429.

306.    The 1557 Rule does not provide a limiting construction for what the current standard of care is, nor does it provide guidance as to how physicians can rely on their best medical judgment when it conflicts with the 1557 Rule.

307.    The 1557 Rule is not justified by a compelling governmental interest.

308.    Even if HHS has a compelling government interest, the 1557 Rule is not narrowly tailored to achieve that interest.

309.    Because CBA members are unable to determine what kind of procedures and services they will be required to provide and perform, Defendants have violated CBA members' rights secured to them by the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment.

310.    Absent injunctive and declaratory relief against the 1557 Rule, the CBA and its members have been and will continue to be harmed.

## COUNT VIII

### Violation of the First Amendment of the United States Constitution
### Free Exercise Clause and Freedom of Speech
### Unbridled Discretion

311.    Plaintiffs incorporate by reference all preceding paragraphs.

61

312.     The 1557 Rule "applies to every health program or activity, any part of which receives Federal financial assistance provided or made available by the Department; every health program or activity administered by the Department; and every health program or activity administered by a Title I entity." 45 C.F.R. 92.2(a).

313.     The 1557 Rule also states: "The determination of whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent." 81 Fed. Reg. at 31,377.

314.     The 1557 Rule also says: "Insofar as the application of any requirement under this part would violate applicable Federal statutory protections for religious freedom and conscience, such application shall not be required." 45 C.F.R. 92.2(b)(2).

315.     Because the Defendants have sole discretion over financial assistance provided or made available, and because Defendants have sole discretion over the application of the 1557 Rule and any religious freedom protection that applies, the 1557 Rule vests unbridled discretion over which organizations will have their First Amendment interests accommodated.

316.     In Title IX of the Education Amendments of 1972, Congress precluded discrimination on the basis of "sex" in federally funded education programs, "except that . . . this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)-(a)(3). Defendants have exercised unbridled discretion by declining to apply the clear religious freedom protections of Title IX.

317.     In Title IX of the Education Amendments of 1972, Congress banned sex discrimination in federally funded education programs, except that it made clear that "[n]othing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion. Nothing in this section shall be construed to permit a penalty to be imposed on any person or individual because such

person or individual is seeking or has received any benefit or service related to a legal abortion." 20 U.S.C. § 1688. Defendants have exercised unbridled discretion by declining to apply the clear abortion protections of Title IX.

318.     Defendants' actions therefore violate CBA members' rights not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to them by the First Amendment of the United States Constitution.

319.     Absent injunctive and declaratory relief against the 1557 Rule, the CBA and its members have been and will continue to be harmed.

## COUNT IX

### Violation of the First Amendment to the United States Constitution
### Free Speech Clause
### Unconstitutional Conditions

320.     Plaintiffs incorporate by reference all preceding paragraphs.

321.     The 1557 Rule imposes an unconstitutional condition on Plaintiffs' receipt of federal funding.

322.     The 1557 Rule applies to any healthcare provider who accepts federal funding from any source for any program.

323.     The 1557 Rule requires CBA members to adopt policies regarding standards of care for patients that violate Plaintiffs' religious and conscientious beliefs, as well as their medical judgment, and also interfere with CBA members' practice of medicine.

324.     Defendants' actions therefore impose an unconstitutional condition on CBA members' receipt of federal funding and violate Plaintiffs' rights as secured to them by the First and Fourteenth Amendments of the United States Constitution.

325.     Absent injunctive and declaratory relief against the 1557 Rule, the CBA and its members have been and will continue to be harmed.

63

## COUNT X

### Violation of the First Amendment
### Freedom of Speech
### Expressive Association

326.    Plaintiffs incorporate by reference all preceding paragraphs.

327.    CBA members believe and teach that participating in actions, procedures, and services with the goal of transitioning from one sex to another violate their religious beliefs.

328.    CBA members believe and teach that participating in actions, procedures, and services that result in elective sterilizations violate their religious beliefs.

329.    CBA members believe and teach that participating in actions, procedures, and services related to abortion violate their religious beliefs.

330.    The ACTS Mandate would compel CBA members to participate in procedures, services, and activities that contradict their religious beliefs and message.

331.    The ACTS Mandate would compel CBA members to offer health coverage for procedures, services, and activities that violate their religious beliefs and message.

332.    Defendants' actions thus violate CBA members' rights of expressive association as secured to them by the First Amendment of the United States Constitution.

333.    Absent injunctive and declaratory relief against the ACTS Mandate, the CBA and its members have been and will continue to be harmed.

334.    The ACTS Mandate exposes CBA members to civil suits that would hold them liable for practicing and expressing their sincerely held religious beliefs.

335.    The ACTS Mandate furthers no compelling governmental interest.

336.    The ACTS Mandate is not the least restrictive means of furthering Defendants' stated interests.

64

## COUNT XI

**Violation of the Religious Freedom Restoration Act
Compelled Medical Services**

337.    Plaintiffs incorporate by reference all preceding paragraphs.

338.    CBA members' sincerely held religious beliefs prohibit them from deliberately offering services and performing (or referring for) operations or other procedures required by the 1557 Rule. CBA members' compliance with these beliefs is a religious exercise.

339.    CBA members sincerely held religious beliefs prohibit them facilitating gender transition procedures. CBA members' compliance with these beliefs is a religious exercise.

340.    CBA members' sincerely held religious beliefs prohibit them facilitating sterilization procedures. CBA members' compliance with these beliefs is a religious exercise.

341.    CBA members' sincerely held religious beliefs prohibit them facilitating abortion-related services. CBA members' compliance with these beliefs is a religious exercise.

342.    The 1557 Rule creates government-imposed coercive pressure on CBA members to change or violate their religious beliefs.

343.    The 1557 Rule chills CBA members' religious exercise.

344.    The 1557 Rule exposes CBA members to the loss of substantial government funding as a result of their religious exercise.

345.    The 1557 Rule exposes CBA members to substantial penalties under the False Claims Act, 31 U.S.C. § 3729 et seq.

346.    The 1557 Rule exposes CBA members to criminal penalties under 18 U.S.C. § 1035.

347.    The 1557 Rule exposes CBA members to civil suits that would hold them liable for practicing their sincerely held religious beliefs.

348.    The 1557 Rule thus imposes a substantial burden on the CBA's and its members' religious exercise.

65

349.   The 1557 Rule furthers no compelling governmental interest.

350.   The 1557 Rule is not the least restrictive means of furthering Defendants' stated interests.

351.   The 1557 Rule violates the CBA's and its members' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

## COUNT XII

### Violation of the Religious Freedom Restoration Act
### Compelled Insurance Coverage

352.   Plaintiffs incorporate by reference all preceding paragraphs.

353.   For the same reasons discussed above, CBA members' sincerely held religious beliefs prohibit them from deliberately offering health insurance that would cover gender transition procedures, sterilization procedures, or abortion-related procedures.

354.   CBA members specifically exclude coverage of any services related to gender transition procedures and abortion in their group health plans.

355.   CBA members' compliance with these beliefs by maintaining these exclusions is a religious exercise.

356.   Under the ACTS Mandate, insurance exclusions related to gender transition are facially invalid.

357.   Under the ACTS Mandate, insurance exclusions related to sterilization are facially invalid.

358.   Under the ACTS Mandate, insurance exclusions related to abortion services are facially invalid under the 1557 Rule.

359.   The ACTS Mandate exposes CBA members to the loss of substantial government funding as a result of their religious exercise.

66

360.     The ACTS Mandate also makes it more expensive for CBA members to do business with a third party administrator for a health benefits plan. The ACTS Mandate subjects third party administrators to potential liability for administering plans that reflect Catholic teachings by categorically excluding gender transition and abortion services, and thus CBA members will be forced to indemnify any third party administrator from this liability. This constitutes an additional substantial burden on the CBA's and its members' religious exercise.

361.     The ACTS Mandate exposes CBA members to substantial penalties under the False Claims Act, 31 U.S.C. § 3729 et seq.

362.     The ACTS Mandate exposes CBA members to criminal penalties under 18 U.S.C. § 1035.

363.     The ACTS Mandate exposes CBA members to civil suits that would hold them liable for practicing their sincerely held religious beliefs.

364.     The ACTS Mandate thus imposes a substantial burden on the CBA's and its members' religious exercise.

365.     The ACTS Mandate furthers no compelling governmental interest.

366.     The ACTS Mandate is not the least restrictive means of furthering Defendants' stated interests.

367.     The ACTS Mandate violates the CBA's and its members' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

## COUNT XIII

### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

368.     Plaintiffs incorporate by reference all preceding paragraphs.

369.     CBA members object to providing, facilitating, covering, or otherwise participating in gender transition procedures.

370.     The ACTS Mandate imposes substantial burdens on CBA members by forcing them to choose between their exercise of religion and the avoidance of fines, penalties, liability, and other adverse consequences.

371.     The ACTS Mandate seeks to suppress the religious practice of individuals and organizations such as CBA members, while allowing exemptions for similar conduct based on secular and non-religious reasons. Thus, the ACTS Mandate is neither neutral nor generally applicable.

372.     The ACTS Mandate is not justified by a compelling governmental interest.

373.     Even if HHS has a compelling government interest, the ACTS Mandate is not narrowly tailored to achieve that interest.

374.     Defendants' actions thus violate the CBA's and its members' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

375.     Absent injunctive and declaratory relief against the ACTS Mandate, the CBA and its members have been and will continue to be harmed.

## COUNT XIV

### Violation of the Fifth Amendment to the United States Constitution
### Due Process Clause
### Substantive Due Process

376.     Plaintiffs incorporate by reference all preceding paragraphs.

377.     The United States has a deeply rooted tradition of honoring physicians' and healthcare institutions' rights to provide medical treatment in accordance with their moral and religious beliefs.

378.     CBA members possess a fundamental right of liberty of conscience.

379.    CBA members possess a fundamental right not to be coerced to provide medical procedures and services in violation of their conscience.

380.    The ACTS Mandate coerces CBA members to provide medical services and coverage in violation of their conscience.

381.    Defendants' conduct cannot be justified by a compelling governmental interest.

382.    The ACTS Mandate is not justified by a compelling governmental interest.

383.    Even if Defendants have a compelling government interest, the ACTS Mandate is not narrowly tailored to achieve that interest.

384.    Defendants' actions therefore violate CBA members' rights to substantive due process.

385.    Absent injunctive and declaratory relief against the ACTS Mandate, the CBA and its members have been and will continue to be harmed.

### COUNT XV

**Violation of the Fifth Amendment to the United States Constitution
Due Process and Equal Protection**

386.    Plaintiffs incorporate by reference all preceding paragraphs.

387.    The Due Process Clause of the Fifth Amendment mandates the equal treatment of all religious faiths and institutions without discrimination or preference.

388.    The ACTS Mandate discriminates on the basis of religious views or religious status by refusing to recognize religious exemptions that exist in the law.

389.    The ACTS Mandate discriminates on the basis of religious views or religious status by refusing to recognize valid medical views of religious healthcare professionals on gender transition procedures.

69

390.     The Defendants' actions thus violate Plaintiffs' rights secured to them by the Fifth Amendment of the United States Constitution.

391.     Absent injunctive and declaratory relief against the ACTS Mandate, the CBA and its members have been and will continue to be harmed.

## IX.     PRAYER FOR RELIEF

Wherefore Plaintiffs request that the Court:

a.     Declare that neither the Affordable Care Act nor Title VII, nor any regulations or other executive actions promulgated thereunder, shall infringe on the CBA's and its members' right and power to request, design, contract for, adopt, and implement health plans and insurance policies that exclude coverage of health services for gender transition and abortion consistent with their medical judgment and sincerely held religious beliefs.

b.     Declare that the ACTS Mandate and Defendants' enforcement of the Mandate against the CBA and its members violate the Administrative Procedure Act, and that no taxes, penalties, or other burdens can be charged or assessed against the CBA or its members for failure to pay for, provide, or directly or indirectly facilitate access to abortion or gender transition services.

c.     Declare that the ACTS Mandate and Defendants' enforcement of the Mandate against the CBA and its members violate the Religious Freedom Restoration Act, and that no taxes, penalties, or other burdens can be charged or assessed against the CBA or its members for failure to pay for, provide, or directly or indirectly facilitate access to abortion or gender transition services.

d.     Declare that the ACTS Mandate and Defendants' enforcement of the Mandate against the CBA and its members violate the laws and constitutional provisions

described in their causes of action and that no taxes, penalties, or other burdens can be charged or assessed against the CBA or its members for failure to pay for, provide, or directly or indirectly facilitate access to abortion or gender transition services.

e.      Declare that Defendants may not apply or enforce the ACTS Mandate against the insurers and TPAs of CBA members; may not interfere with members' attempts to arrange or contract for morally compliant health coverage or related services for their employees; and that no taxes, penalties, or other burdens can be charged or assessed against such insurers or TPAs in relation to their work for CBA members;

f.      Declare that CBA members have the right to contract with service providers, including insurers and third party administrators, to secure morally compliant health plans.

g.      Issue a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants from:

    i.      Enforcing the ACTS Mandate against the CBA and its present and future members;

    ii.     Charging or assessing fines, taxes, penalties, or other burdens against the CBA and its present and future members for failure to provide, perform, pay for, cover, or facilitate access to health services for gender transition and abortion;

    i.      Removing or threatening to remove federal funding, reimbursements, payments, or benefits of any kind from the CBA's present and future members for failure to provide, perform, pay for, cover, or facilitate access to health services for gender transition and abortion;

71

    ii.    Removing or threatening to remove access to federal contracts, grants, and programs from the CBA's present and future members for failure to provide, perform, pay for, cover, or facilitate access to health services for gender transition and abortion;

    iii.    Applying or enforcing the ACTS Mandate against the insurers and TPAs of the CBA's present and future members; and

    iv.    Interfering with the CBA's present and future members' relationships with their insurers or TPAs and with those members' attempts to contract for morally compliant health coverage for their employees.

h.    Award Plaintiffs the costs of this action and reasonable attorney's fees as provided by law, including 28 U.S.C. § 2412(d) and 42 U.S.C. § 1988(b); and

i.    Award such other and further relief as the Court deems equitable and just.

<Signature page follows>

DATED: December 28, 2016.

Respectfully submitted,

L. Martin Nussbaum
Eric Kniffin
Ian Speir
Lewis Roca Rothgerber Christie LLP
90 S. Cascade Ave., Suite 1100
Colorado Springs, CO 80903
719-386-3000; f:719-386-3070
mnussbaum@lrrc.com
ekniffin@lrrc.com
ispeir@lrrc.com
*Motions for Admission Pending*

Attorneys for Plaintiffs

sdg

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing allegations pertaining the teachings of the Catholic Church and to The Catholic Benefits Association are true and correct to the best of my knowledge.

I further declare under penalty of perjury that Exhibit A attached hereto is a true and accurate copy of the Amended and Restated Certificate of Incorporation of The Catholic Benefits Association and that Exhibit B is a true and accurate copy of the Amended and Restated Bylaws of The Catholic Benefits Association.

Executed on December 28, 2016.

/s/ Most Rev. William E. Lori
Most Rev. William E. Lori
Archbishop of Baltimore
President, The Catholic Benefits Association

100021819_11

## <u>VERIFICATION PURSUANT TO 28 U.S.C. § 1746</u>

I declare under penalty of perjury that the foregoing allegations pertaining to The Catholic Benefits Association and its members are true and correct to the best of my knowledge.

Executed on December 28, 2016.

<u>/s/ Nancy Matthews</u>
Nancy Matthews, Esq.
Director of Membership,
  The Catholic Benefits Association
Corporate Secretary,
  The Catholic Benefits Association

75

## <u>VERIFICATION PURSUANT TO 28 U.S.C. § 1746</u>

I declare under penalty of perjury that the foregoing allegations pertaining to the Diocese of Fargo are true and correct to the best of my knowledge.

Executed on December 28, 2016.

/s/ Scott Hoselton
Scott Hoselton, CPA, CDFM, CGMA
Chief Financial Officer, Diocese of Fargo

100021819_11

## <u>VERIFICATION PURSUANT TO 28 U.S.C. § 1746</u>

I declare under penalty of perjury that the foregoing allegations pertaining to Catholic Charities North Dakota are true and correct to the best of my knowledge.

Executed on December 28, 2016.

<u>/s/ Dianne Nechiporenko</u>
Dianne Nechiporenko
Executive Director, Catholic Charities North Dakota

100021819_11